# MARYELLEN O'SHAUGHNESSY

## FRANKLIN COUNTY CLERK OF COURTS
## GENERAL DIVISION, COURT OF COMMON PLEAS

### ANDY D MILLER

CASE TITLE:  CARDINAL HEALTH 110 LLC ET AL -VS- CGM INC ET AL     CASE NUMBER: 21CV005468

## CLERK'S ORIGINAL CASE SCHEDULE

| | LATEST TIME OF OCCURRENCE |
|---|---|
| CASE FILED | 08/27/21 |
| INITIAL DISCLOSURES OF THE PARTIES [CIV. R. 26(B)(3)] | 10/22/21 |
| CASE MANAGEMENT/PRETRIAL CONFERENCE WITH COURT | 03/10/22 0130PM |
| EXPERT WITNESS [CIV. R. 16(B)(7)] | |
| DISCLOSE IDENTITY - PARTY WITH BURDEN | 04/14/22 |
| DISCLOSE IDENTITY - PARTY WITHOUT BURDEN | NO LATER THAN 30 DAYS AFTER OPPOSING DISCLOSURE |
| EXPERT REPORT & CV DUE - PARTY WITH BURDEN | 05/12/22 |
| EXPERT REPORT & CV DUE - PARTY WITHOUT BURDEN | NO LATER THAN 45 DAYS AFTER OPPOSING REPORTS |
| DISPOSITIVE MOTION DEADLINE | 07/14/22 |
| DISCOVERY CUTOFF DATE | 08/11/22 |
| FINAL PRETRIAL CONFERENCE | 11/08/22 0130PM |
| TRIAL ASSIGNMENT | 11/22/22 0900AM |

**EXHIBIT A**

## NOTICE TO ALL PARTIES

Attorneys and unrepresented parties must become familiar with the 2020 amendments to the Ohio Rules of Civil Procedure and this court's Local Rules.

The Original Case Schedule is an important tool to assist the parties and the court in meeting case management guidelines in the Ohio Superintendence Rules, and otherwise achieving timely disposition of civil cases notwithstanding the priority given to criminal cases under Crim. R. 50.

Judicial Officers of this court may modify the Original Case Schedule following receipt of the parties' Joint Discovery Plan, or for good cause at any other point in the case. However, it is essential for attorneys and unrepresented parties to pursue their cases diligently from the outset. Deadlines set in the Rules and in this Original Case Schedule are normally binding, not merely aspirational.

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

**CARDINAL HEALTH 110, LLC**   :
7000 Cardinal Place   :
Dublin, Ohio 43017,   :
  :   **Case No.**
and   :
  :   **Judge:**
**MEDICINE SHOPPE INTERNATIONAL,**   :
**INC.**   :
7000 Cardinal Place   :
Dublin, Ohio 43017   :
  :
   Plaintiff,   :
  :
v.   :
  :
**CGM, INC. D/B/A THE MEDICINE**   :
**SHOPPE #1868**   :
1144 Airport Drive   :
Alexander City, Alabama 35010   :
Attn: Sherry D. Tremelling, Registered Agent,   :
  :
and   :
  :
**JOHN RICHARDSON**   :
1116 Graylynn Drive   :
Vestavia, Alabama 35216,   :
  :
and   :
  :
**SHERRY D. TREMELLING**   :
**aka SHERRY RICHARDSON**   :
963 Goodwater Road   :
Alexander City, Alabama 35010   :
  :
   Defendants.   :
  :

## **COMPLAINT**

Plaintiffs, Cardinal Health 110, LLC ("CH 110") and Medicine Shoppe International, Inc.

("MSI", and together with CH 110, "Plaintiff" or "Cardinal Health"), file this Complaint against

Defendants, CGM, Inc. d/b/a The Medicine Shoppe #1868 ("CGM"), John Richardson ("Richardson") and Sherry D. Tremelling aka Sherry Richardson ("Tremelling", and together with CGM and Richardson, collectively, the "Defendants"), and allege and state as follows:

## PARTIES, JURISDICTION AND VENUE

1.     CH 110 is a Delaware limited liability company registered to do business in Ohio with its principal place of business located in Dublin, Ohio.  CH 110 is a subsidiary of Cardinal Health, Inc., and, among other things, specializes in the distribution of pharmaceutical products.

2.     MSI is a Delaware corporation registered to do business in Ohio with its principal place of business located in Dublin, Ohio.  MSI is a subsidiary of Cardinal Health, Inc., and a franchisor of independent community pharmacies.

3.     CGM is an Alabama corporation with its principal place of business in Alexander City, Alabama.

4.     Richardson is an individual residing in Vestavia, Alabama.  Richardson was the incorporator of CGM, and guaranteed CGM's obligations to Cardinal Health.

5.     Tremelling is an individual residing in Alexander City, Alabama.   Upon information and belief, Tremelling is the president and an owner of CGM.   Tremelling also guaranteed CGM's obligations to Cardinal Health.

6.     Jurisdiction and venue are proper in this Court as the amount in controversy exceeds the jurisdictional limit and the Defendants each consented to jurisdiction and venue in the judicial district pursuant to a forum selection clause contained in one or more documents forming the subject of this Complaint, including, without limitation, the Medicine Shoppe Franchise Agreement effective of July 1, 2009, by and between MSI and CGM, as modified and supplemented by the Legacy Franchise Addendum to Franchise Agreement by and between MSI

2

and CGM (collectively, the "Franchise Agreement"). A true, correct and complete copy of the Franchise Agreement is attached hereto, and incorporated herein, as *Exhibit A.*

## FACTS COMMON TO ALL CLAIMS

### Credit Application

7.     On or about June 25, 2008, CGM executed and delivered a credit application (the "Credit Application") to CH 110. A true, correct and complete copy of the Credit Application (except for the redaction of social security numbers, tax ID numbers and other private financial information) is attached hereto, and incorporated herein, as *Exhibit B.*

8.     The Credit Application sets forth CH 110's agreement to accept orders from CGM on credit in exchange for CGM's agreement to pay CH 110 for such orders in full in accordance with the applicable payment terms.

9.     As part of the Credit Application and as a condition to CH 110's agreement to accept orders from CGM on credit, CGM granted Cardinal Health a security interest in all of CGM's business assets, including, but not limited to, all goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible (the "Collateral"). (*See* Credit Application (Exhibit B), Section V (the "Security Agreement")).

10.     Cardinal Health properly perfected its security interest in the Collateral by filing a UCC Financing Statement with the Alabama Secretary of State on or about June 7, 2017, Filing Number 17-7279600. A true, correct and complete copy of the UCC Financing Statement is attached hereto as *Exhibit C.*

11.     On or about June 25, 2008, in connection with the Credit Application and as a

condition to CH 110's agreement to accept orders from CGM on credit, Richardson executed and delivered to CH 110 a personal guaranty pursuant to which he guaranteed to Cardinal Health the punctual and full payment (and not merely the ultimate collection) of all of CGM's indebtedness and obligations of every kind to Cardinal Health whether then existing or thereafter arising. (Credit Application (Exhibit B), Section VI (the "Richardson Credit Guaranty")).

12.     On or about June 25, 2008, in connection with the Credit Application and as a condition to CH 110's agreement to accept orders from CGM on credit, Tremelling executed and delivered to CH 110 a personal guaranty pursuant to which she guaranteed to Cardinal Health the punctual and full payment (and not merely the ultimate collection) of all of CGM's indebtedness and obligations of every kind to Cardinal Health whether then existing or thereafter arising. (Credit Application (Exhibit B), Section VI (the "Tremelling Credit Guaranty")).

13.     Based upon CGM's credit history, among other things, CH 110 agreed to certain payment terms for CGM.

14.     Pursuant to the terms of the Credit Application, CGM ordered and received from CH 110, and CH 110 delivered to CGM, certain pharmaceutical products (the "Products") on open account (the "Trade Accounts").

15.     CGM did not reject or return the Products to CH 110.

16.     CGM failed to pay CH 110 for the Products in full and in accordance with the applicable payment terms.

17.     Subsequently, CH 110 made a demand to the Defendants for payment of the debt owed on the Trade Accounts.

18.     Defendants refused to pay the debt owed to CH 110 on the Trade Accounts.

19. Section III, paragraph 5 of the Credit Application entitles CH 110 to assess a service charge calculated at the rate of one and one-half percent (1.5%) per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by CGM to CH 110 when due. This same section of the Credit Application also requires CGM to pay all out-of-pocket expenses, including attorneys' fees and costs, incurred by CH 110 to collect any amounts due under, or to otherwise enforce any of the terms of, the Credit Application.

20. As of July 31, 2021, CGM owed $489,386.74to CH 110 on the Trade Accounts, exclusive of applicable service charges. Attached hereto as **Exhibit D** is a summary setting forth each unpaid invoice provided to CGM by CH 110 in connection with the Trade Accounts.

### Franchise Agreement

21. Effective as of July 1, 2009, CGM and MSI entered into the Franchise Agreement.

22. MSI agreed under the Franchise Agreement to provide a core package of services (the "Franchise Services") to CGM, including, without limitation, the right to use MSI's service mark and other intellectual property, in exchange for CGM's payment of a continuing monthly license fee and any other applicable additional fees.

23. On or about July 1, 2009, in connection with the Franchise Agreement and as a condition to MSI's agreement to enter into the Franchise Agreement, Richardson executed and delivered to MSI a personal guaranty pursuant to which he guaranteed to MSI the full payment of all of fees required to be paid by CGM to MSI "whether provided for in the Franchise Agreement or under any other agreement between the Company and Franchisee..." (*See* Franchise Agreement (Exhibit A), p. 21 (the "Richardson Franchise Guaranty").)

24.     On or about July 1, 2009, in connection with the Franchise Agreement and as a condition to MSI's agreement to enter into the Franchise Agreement, Tremelling executed and delivered to MSI a personal guaranty pursuant to which she guaranteed to MSI the full payment of all of fees required to be paid by CGM to MSI "whether provided for in the Franchise Agreement or under any other agreement between the Company and Franchisee..."  (*See* Franchise Agreement (Exhibit A), p. 21 (the "Tremelling Franchise Guaranty").)

25.     Pursuant to the terms of the Franchise Agreement, MSI provided the Franchise Services to CGM, and CGM received and used the Franchise Services.

26.     Pursuant to the terms of the Franchise Agreement, MSI invoiced CGM for the continuing license fees on a monthly basis.

27.     CGM failed or refused to pay MSI for the continuing license fees under the Franchise Agreement on and after December 2019.

28.     MSI made a demand upon CGM for payment of the continuing license fees under the Franchise Agreement.

29.     Despite demand, CGM continues to fail or refuse to pay the continuing license fees to MSI.

30.     CGM owes the principal sum of $34,431.00 to MSI for the monthly license fees under the Franchise Agreement.

31.     Pursuant to Section III, Paragraph C of the Franchise Agreement, MSI is entitled to interest at the rate of 1.5% per month on any amount not paid by CGM to MSI when due under the Franchise Agreement.

## FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT
## (CREDIT APPLICATION)

32.     Cardinal Health hereby adopts the preceding paragraphs and incorporates them by

reference as if fully restated herein.

33.     CH 110 performed in accordance with the terms of the Credit Application by supplying the Products to CGM on credit.

34.     CGM failed to comply with the terms of the Credit Application by, in part, refusing to fully and timely pay CH 110 for the Products.

35.     CGM's non-performance constitutes a breach of the Credit Application.

36.     As a result of the breach, CH 110 has suffered damages.  In particular, CH 110 has been damaged by providing CGM with an extension of credit for the purchase of the Products for which CGM did not fully and timely pay CH 110.

37.     The sum of $489,386.74, together with service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if such rate is less than 1.5% per month) through the date of collection, plus all collection costs and attorney's fees, is due and owing to CH 110 by CGM under the terms of the Credit Application.

## SECOND CLAIM FOR RELIEF – GOODS SOLD AND DELIVERED (ALTERNATIVE TO FIRST CLAIM FOR RELIEF)

38.     Cardinal Health re-alleges and incorporates paragraphs 1 through 31 as if fully set forth herein.

39.     From time to time, CGM ordered pharmaceutical products, including the Products, from CH 110.

40.     CH 110 delivered the Products to CGM and CGM accepted, used, and received all the benefits of the Products at CH 110's expense.

41.     CGM has not fully paid CH 110 for the Products.

42.     CGM owes CH 110 the amount due for the Products.

43.     The sum of $489,386.74, plus service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if such rate is less than 1.5% per month) through the date of collection, and all attorneys' fees and court costs, is due and owing to CH 110 by CGM on the Trade Accounts.

### THIRD CLAIM FOR RELIEF – POSSESSION OF COLLATERAL

44.     Cardinal Health re-alleges and incorporates paragraphs 1 through 31 as if fully set forth herein.

45.     Pursuant to the security interest that CGM granted CH 110Cardinal Health in the Credit Application, Cardinal Health is entitled to possession of the Collateral upon default by CGM.

46.     CGM is in default of its obligations to Cardinal Health as herein alleged.

47.     Cardinal Health is entitled to an order and judgment authorizing it to take immediate possession of the Collateral.

### FOURTH CLAIM FOR RELIEF – CLAIM ON ACCOUNT
### (ALTERNATIVE TO FIRST AND SECOND CLAIMS FOR RELIEF)

48.     Cardinal Health re-alleges and incorporates paragraphs 1 through 31 as if fully set forth herein.

49.     The prices charged by CH 110 for the Products were in accordance with the terms of the Credit Application, or the usual and customary prices charged for the Products pursuant to industry standards.

50.     CH 110 kept a systematic record of the transactions and all just, lawful offsets have been applied to the Trade Accounts.

51.     The Trade Accounts remain unpaid in the total amount of $489,386.74, plus service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if lower) through the date of collection, and all attorneys' fees and court costs, for the Products.

## FIFTH CLAIM FOR RELIEF – BREACH OF CONTRACT
## (FRANCHISE AGREEMENT)

52.     Cardinal Health re-alleges and incorporates paragraphs 1 through 31 as if fully set forth herein.

53.     MSI performed in accordance with the terms of the Franchise Agreement by, among other things, furnishing the Franchise Services to CGM.

54.     CGM failed to timely and fully pay MSI for the continuing monthly license fees in accordance with the terms of the Franchise Agreement.

55.     CGM's failure to timely and fully pay MSI for the continuing monthly license fees constitutes a breach of the Franchise Agreement by CGM.

56.     As a result of CGM's breach of the Franchise Agreement, MSI has suffered damages.  In particular, MSI has been damaged by providing CGM with Franchise Services for which CGM did not pay.

57.     Pursuant to the terms of the Franchise Agreement, the sum of $34,431.00, together with service charges accruing at the rate of 1.5% per month until the date of collection, is due and owing to MSI by CGM.

## SIXTH CLAIM FOR RELIEF – QUANTUM MERUIT

58.     Cardinal Health re-alleges and incorporates paragraphs 1 through 31 as if fully set forth herein.

59.     In response to CGM's promise of payment, Cardinal Health provided Franchise Services and pharmaceutical products, including the Products, for CGM's benefit.

60.     Based on the Credit Application, Franchise Agreement and CGM's request that Cardinal Health provide the Products and Franchise Services, Cardinal Health reasonably expected to be paid by CGM for the value of the Products and Franchise Services.

61.     CGM used, accepted, and benefitted from the Franchise Services and pharmaceutical products, including the Products, provided by Cardinal Health, but did not fully and timely pay Cardinal Health for the Products and Franchise Services as promised.

62.     CGM received a valuable benefit from Cardinal Health in the form of the Products and Franchise Services.

63.     CGM was aware that Cardinal Health was providing the Products and Franchise Services with the expectation of being paid therefor, and CGM accepted the Products and Franchise Services.

64.     Cardinal Health has been damaged by CGM's retention of the Products and use of the Franchise Services without full payment, in violation of the fundamental principles of justice, equity and good conscience.

65.     It would be unjust for CGM to retain the benefits conferred upon it by Cardinal Health.

66.     Cardinal Health is entitled to recover from CGM the reasonable value of the Products and Franchise Services.

67.     The total reasonable value of the wrongfully retained Products is not less than $489,386.74, which reflects the amounts charged by Cardinal Health for the Products, that CGM retained without making payment; and the total reasonable value of the wrongfully used Franchise Services is not less than $34,431.00.

## SEVENTH CLAIM FOR RELIEF – BREACH OF GUARANTY
## (JOHN RICHARDSON)

68.     Cardinal Health re-alleges and incorporates paragraphs 1 through 67 as if fully set forth herein.

69.     In order to induce Cardinal Health to (a) provide pharmaceutical products, including the Products, to CGM on credit, and (b) enter into the Franchise Agreement with CGM, Richardson executed and delivered the Richardson Credit Guaranty and the Richardson Franchise Guaranty (collectively, the "Richardson Guaranty"), respectively, to Cardinal Health.

70.     By executing the Richardson Guaranty, Richardson unconditionally guaranteed the payment and performance of CGM's obligations to Cardinal Health.

71.     Cardinal Health was induced to supply and did supply pharmaceutical products, including the Products, to CGM on credit as well as enter into the Franchise Agreement with CGM after obtaining the Richardson Guaranty.

72.     Richardson has breached the Richardson Guaranty by failing to pay to Cardinal Health the monies owed by CGM to Cardinal Health for the Products and/or under the Franchise Agreement after CGM failed to pay such debts.

73.     As a result of Richardson's breach of the Richardson Guaranty, Cardinal Health has suffered damages in the total amount of $523,817.74, plus service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if lower) through the date of collection, and all attorneys' fees and court costs.

## EIGHTH CLAIM FOR RELIEF – BREACH OF GUARANTY
## (SHERRY D. TREMELLING)

74.     Cardinal Health re-alleges and incorporates paragraphs 1 through 67 as if fully set forth herein.

75.     In order to induce Cardinal Health to (a) provide pharmaceutical products, including the Products, to CGM on credit and (b) enter into the Franchise Agreement with CGM, Tremelling executed and delivered the Tremelling Credit Guaranty and Tremelling Franchise Guaranty (collectively, the "Tremelling Guaranty"), respectively, to Cardinal Health.

76.     By executing the Tremelling Guaranty, Tremelling unconditionally guaranteed the payment and performance of CGM's obligations to Cardinal Health.

77.     Cardinal Health was induced to supply and did supply pharmaceutical products, including the Products, to CGM on credit and enter into the Franchise Agreement with CGM after obtaining the Tremelling Guaranty.

78.     Tremelling has breached the Tremelling Guaranty by failing to pay to Cardinal Health the monies owed by CGM to Cardinal Health for the Products and/or under the Franchise Agreement after CGM failed to pay such debts.

79.     As a result of Tremelling's breach of the Tremelling Guaranty, Cardinal Health has suffered damages in the total amount of $523,817.74, plus service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if lower) through the date of collection, and all attorneys' fees and court costs.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs Cardinal Health 110, LLC and Medicine Shoppe International, Inc. demand judgment against Defendants CGM, Inc. d/b/a The Medicine Shoppe #1868, John Richardson and Sherry D. Tremelling aka Sherry Richardson, jointly and severally, as follows:

(a) Damages in the aggregate amount of $523,817.74, consisting of $489,386.74 owed to CH 110 and $34,431.00 owed to MSI;

(b) Service charges accruing at the rate of 1.5% per month (or the highest rate allowed by law if such rate is less than 1.5% per month), until the date of collection;

(c) Collections costs and attorneys' fees;

(d) An order granting Cardinal Health possession of the Collateral; and

(e) Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

*/s/ Susan K. Cliffel*
Susan K. Cliffel          (0046915)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 East Fifth Street, Suite 2200
Cincinnati, OH 45202
T:       (513) 369-4215
F:       (513) 421-0991
scliffel@porterwright.com

Allen T. Carter          (0085393)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, Ohio 43215
T:       (614) 227-2000
F:       (614) 227-2100
acarter@porterwright.com.com

*Attorneys for Plaintiff*

# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| **CARDINAL HEALTH 110, LLC** | : | |
| 7000 Cardinal Place | : | |
| Dublin, Ohio 43017, | : | |
| | : | **Case No.** |
| and | : | |
| | : | **Judge:** |
| **MEDICINE SHOPPE** | : | |
| **INTERNATIONAL, INC.** | : | |
| 7000 Cardinal Place | : | |
| Dublin, Ohio 43017 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **CGM, INC. D/B/A THE MEDICINE** | : | |
| **SHOPPE #1868** | : | |
| 1144 Airport Drive | : | |
| Alexander City, Alabama 35010 | : | |
| Attn: Sherry D. Tremelling, Registered | : | |
| Agent, | : | |

and

**JOHN RICHARDSON**
1116 Graylynn Drive
Vestavia, Alabama 35216,

and

**SHERRY D. TREMELLING**
**aka SHERRY RICHARDSON**
963 Goodwater Road
Alexander City, Alabama 35010

     Defendants.

## <u>PRAECIPE</u>

TO THE CLERK OF COURTS: Please issue the Summons and Complaint for service to the following Defendants at the following addresses by **certified mail, return receipt requested:**

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 27 3:04 PM-21CV005468

**CGM, INC. D/B/A THE MEDICINE SHOPPE
#1868**
1144 Airport Drive
Alexander City, Alabama 35010
Attn: Sherry D. Tremelling, Registered Agent

**JOHN RICHARDSON**
1116 Graylynn Drive
Vestavia, Alabama 35216

**SHERRY D. TREMELLING
aka SHERRY RICHARDSON**
963 Goodwater Road
Alexander City, Alabama 35010

Respectfully submitted,

*/s/ Susan K. Cliffel*
Susan K. Cliffel          (0046915)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 East Fifth Street, Suite 2200
Cincinnati, OH 45202
T:       (513) 369-4215
F:       (513) 421-0991
scliffel@porterwright.com

Allen T. Carter          (0085393)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
41 South High Street, Suite 2900
Columbus, Ohio 43215
T:       (614) 227-2000
F:       (614) 227-2100
acarter@porterwright.com.com

*Attorneys for Plaintiff*

# THE MEDICINE SHOPPE®
## FRANCHISE AGREEMENT

### TABLE OF CONTENTS

                                                                    Page No.

SECTION I – GRANT OF LICENSE ...................................................................1
   A.   Site Acquisition..............................................................................1
   B.   Acknowledgment of Nonexclusivity of Grant ..................................2

SECTION II - FRANCHISEE'S GENERAL RESPONSIBILITIES ...............................2
   A.   Establishment and Continued Operation of Business ...........................2
   B.   Marketing and Advertising ...............................................................2
   C.   Identity ........................................................................................2
   D.   Purchase of Items ..........................................................................2
   E.   Inventory and Private Label Products .................................................3
   F.   Notification of Certain Actions ........................................................3
   G.   Adherence to Standards ..................................................................3
   H.   Company Access.............................................................................3
   I.   POS System .................................................................................4
   J.   Computer Systems .........................................................................4
   K.   Use of Claims Switch.....................................................................4
   L.   Communications and Communications Lines .....................................4
   M.   Taxes and Trade Payables................................................................4
   N.   Web Sites .....................................................................................4
   O.   Local Advertising..........................................................................4

SECTION III - FEES .....................................................................................5
   A.   Initial Fees ...................................................................................5
   B.   Continuing License Fees.................................................................5
   C.   Late Payment of Fees.....................................................................5
   D.   Offset - ........................................................................................5

SECTION IV - STANDARDS .........................................................................6
   A.   Policies and Procedures ..................................................................6
   B.   Modifications ...............................................................................6
   C.   Professional Standards ...................................................................6

SECTION V - THE COMPANY'S ASSISTANCE ...................................................7
   A.   Pre-Opening Assistance ..................................................................7
   B.   Marketing Assistance .....................................................................7
   C.   Specialized Care Center .................................................................7
   D.   Additional Assistance ....................................................................7
   E.   Nature of Assistance ......................................................................7

SECTION VI - TERMINATION AND PRE-TERMINATION OPTIONS .......................7
   A.   Termination by Franchisee ..............................................................7
   B.   Termination by the Company ...........................................................7
   C.   The Company's Pre-Termination Options...........................................9

SECTION VII - ACTIONS UPON TERMINATION.................................................9
   A.   Franchisee De-Identification............................................................9
   B.   Cancellation of Listings ..................................................................10

SECTION VIII - ASSIGNMENT......................................................................10

3/09

**EXHIBIT A**

| | A. | Franchisee Assignment | 10 |
| | B. | The Company's Assignment | 12 |

SECTION IX - INTELLECTUAL PROPERTY .................... 12
| | A. | Confidentiality | 12 |
| | B. | Use of Marks | 12 |
| | C. | Information Concerning the Business | 13 |

SECTION X – INSURANCE/INDEMNIFICATION .................... 13
| | A. | Insurance | 13 |
| | B. | Indemnification | 13 |

SECTION XI – INDEPENDENT CONTRACTOR .................... 14

SECTION XII - ENFORCEMENT .................... 14
| | A. | Waivers | 14 |
| | B. | Governing Law | 14 |
| | C. | Venue | 14 |
| | D. | Legal Fees | 15 |
| | E. | Waiver of Punitive Damages | 15 |
| | F. | Waiver of Jury Trial | 15 |
| | G. | Waiver of Collateral Estoppel | 15 |
| | H. | Joint and Several Liability | 15 |

SECTION XIII – TERM .................... 16
| | A. | Term | 16 |
| | B. | No Renewal Rights | 16 |

SECTION XIV – MISCELLANEOUS .................... 16
| | A. | Entire Agreement | 16 |
| | B. | Binding Effect | 17 |
| | C. | Time | 17 |
| | D. | Consent to Communications | 17 |
| | E. | Headings | 17 |
| | F. | The Company's Business Interests | 17 |
| | G. | Notices | 17 |

1237974.2

3/09

THE MEDICINE SHOPPE®
FRANCHISE AGREEMENT

This Agreement is made effective as of July 1, 2009, between Medicine Shoppe International, Inc., a Delaware corporation (the "**Company**") and CGM, Inc., an Alabama corporation ("**Franchisee**").

## RECITALS

The Company has the right to use and license the primary service mark identified on the Rider to this Agreement (the "**Primary Mark**"), in connection with the operation of pharmacy businesses, and has created considerable goodwill for the Company and the network of pharmacies operating under the Primary Mark (the "**Franchised Network**"). In addition, the Company has made arrangements to provide a core package of services to participants in the Franchised Network, some of which services may be offered by affiliates of the Company, or others, and are available to independent pharmacies, while others may be available only to members of the Franchised Network.

Franchisee desires to operate a pharmacy business identified by the Primary Mark and using such other names and logos as may be identified by the Company (collectively with the Primary Mark, the "**Marks**"), with access to the core package of services the Company has arranged to make available to members of the Franchised Network, as they may be modified from time to time, and such other support and systems that the Company may offer to Franchisee from time to time. Franchisee acknowledges that it has read this Agreement and understands and accepts that the terms, conditions and covenants contained in this Agreement are reasonably necessary to maintain the standards of quality and service promoted by the Company and to protect and preserve the goodwill of the Marks. Franchisee further acknowledges that it has conducted an independent investigation of the business venture contemplated by this Agreement and recognizes that it involves business risks, and that the success of the venture is largely dependent upon Franchisee's business abilities. In reliance upon the foregoing acknowledgments, the Company has agreed to grant to Franchisee the license represented by this Agreement (the "**License**") upon the terms and conditions hereinafter set forth:

## SECTION I - GRANT OF LICENSE

The Company hereby grants to Franchisee the right to use the Marks, and the core package of services the Company has arranged to make available to members of the Franchised Network and such other of the Company's marketing and promotional methods, systems, and other procedures and forms used in connection with or applicable to the operation of pharmacies and related health care businesses (collectively, the "**System**"), in the operation by Franchisee of a pharmacy and related health care business (the "**Business**") at the location set forth in the Rider hereto attached and made a part of this Agreement (the "**Rider**").

A.    Site Acquisition - Franchisee acknowledges that it is Franchisee's responsibility to select the site at which the Business is operated. Once Franchisee has selected a prospective site, it shall advise the Company of its selection, and provide any additional information required by the Company so as to enable the Company to determine whether it will approve that site.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 27 3:05 PM-21CV005825

Franchisee shall not take any action to acquire any particular site until the site has been approved by the Company. However, approval of a site is not an endorsement of that site or any assurance the site will prove to be a viable one from which to operate the Business.

     B.   <u>Acknowledgment of Nonexclusivity of Grant</u> - Franchisee acknowledges that the grant of the right to use the Marks and the System in connection with the operation of the Business is a nonexclusive grant, and the Company may, at its option, use the Marks (including the Primary Mark) in connection with the operation of any business, including any pharmacy or the sale of any products or services, and license others to operate such businesses and/or to sell any products or services, at any location outside the specific store premises of the Business, even if such use competes with the Business.

<u>SECTION II - FRANCHISEE'S GENERAL RESPONSIBILITIES</u>

     A.   <u>Establishment and Continued Operation of Business</u> - Franchisee shall establish a retail pharmacy identified under the Primary Mark at the location identified in the Rider, and continue to operate such Business under the Primary Mark, using the System, throughout the term of this Agreement. Franchisee shall keep and maintain in full force and effect a valid pharmacy business license as required by the laws of the state in which the Business is located and ensure that all pharmacists employed by Franchisee are properly licensed in accordance with the laws of that state. Franchisee shall also keep and maintain in full force and effect all required licenses, both state and federal, for the sale of controlled substances in the Business.

     B.   <u>Marketing and Advertising</u> - Franchisee shall participate in various marketing programs as designated from time to time by the Company. Franchisee shall not modify any displays, advertising material, or promotional campaigns provided by the Company that Franchisee elects to use except as the Company may authorize. If Franchisee desires to use any advertising materials or promotional campaigns not provided by the Company, Franchisee shall first submit such materials to the Company for its prior approval. If the Company does not notify Franchisee, within ten (10) business days after receipt of such materials, that the materials have not been approved, Franchisee may begin using the materials. Franchisee shall, however, refrain from using, withdraw, or modify, advertising which in the Company's sole judgment conflicts with policies of the Company or is not in keeping with high ethical and professional standards of the System, even if previously approved by the Company.

     C.   <u>Identity</u> - Franchisee shall utilize insignia, equipment, decals, personnel uniforms, vehicle signs and colors, indoor signs and posters, and such other materials as are required by the Company to maintain uniformity of appearance, identity recognition, point of purchase impact, and full penetration of promotional opportunities.

     D.   <u>Purchase of Items</u> - Franchisee shall purchase equipment, fixtures, supplies, inventory and signs which comply with the specifications of the Company. The Company may, from time to time, provide Franchisee a list of approved suppliers of such items used in the operation of the Business. If provided, the Company may revise the approved supplier list from time to time in its sole discretion. The Franchisee shall purchase certain items, including substantially all pharmaceutical inventory, from the Company's designated supplier. The designated source of supply for any individual item may be the Company, an affiliate of the

Company, or an independent contractor. Franchisee shall refrain from selling any product or service in the Business that has been specifically disapproved by the Company. To assure the maintenance of quality standards in all pharmacies operating under the Primary Mark, the Company reserves the right to require Franchisee to obtain the written approval of the Company prior to the use of any supplier of any item used or sold in the Business, and as a precondition to the granting of such approval may require the proposed supplier to submit to the Company samples of products proposed to be provided to Franchisee for use or sale in the Business. The Company reserves the right to require Franchisee to reimburse the Company for its time and costs in researching suppliers suggested by Franchisee.

E.      Inventory and Private Label Products - Franchisee shall maintain physical inventory requirements and operate the Business as established from time to time by the Company. Franchisee shall also purchase a representative sampling, as determined by the Company, of any available products bearing the Company's private label(s) (which may or may not include the Primary Mark), as may be developed from time to time, in quantities sufficient to meet the demands of Franchisee's customers, and provide such products adequate shelf space.

F.      Notification of Certain Actions - Within five (5) days after Franchisee is aware of the same, Franchisee shall notify the Company of any criminal or civil proceeding, action or lawsuit initiated against the Business or Franchisee related to the operation of the Business or any activity that occurred or was alleged to have occurred in the Business, as well as any criminal investigations against Franchisee or the Business.

G.      Adherence to Standards - Franchisee shall diligently adhere to any standards established by the Company for interior and exterior standard colors, lighting, design, equipment, and fixtures, which have been designed by the Company to create a pleasant, inviting atmosphere and appearance to and in the Business and to provide statewide and national identification. Franchisee will also maintain a neat, orderly arrangement of displayed merchandise and high degree of cleanliness in the Business. Any new construction must conform, subject to zoning regulations and OSHA and other federal and local building laws and regulations, to the Company's then current standards. Franchisee will promptly, after notice from the Company, make such repairs, alteration, repainting, and refurnishing required to bring the premises up to the Company's standards.

H.      Company Access - To enable the Company to maintain the integrity of the System and to confirm Franchisee's compliance with this Agreement, Franchisee shall allow the Company the unqualified right, from time to time during the term of this Agreement, to:

(01)    Review and/or inspect the operations of the Business periodically during each year, which shall include, but not be limited to, the right to (i) conduct or observe a physical inventory of the Business; (ii) remove samples of any products, materials and supplies for testing and analysis; (iii) interview personnel of the Business; (iv) interview customers of the Business; (v) observe and record sales activities in the Business; (vi) photograph (including taking still photos and video depictions) the premises of the Business; and (vii) inspect and copy any books, records and documents relating to the operation of the Business;

(02)    Consult with Franchisee from time to time on operating issues concerning the Business; and

(03)    Obtain information, including purchasing information, from any supplier to the Business.

I.    POS System - The Company may publish standards for a point of sale cash register, and make available for sale to Franchisee a system that meets these standards. Franchisee may, however, use any POS system it chooses in the operation of the Business, but Franchisee acknowledges that if it does not use a system that meets the Company's standards, it may not be able to participate in all of the Company's programs and services.

J.    Computer Systems - The Company may publish standards for a pharmacy dispensing computer and compatible pharmacy software programs, and make available for sale to Franchisee a system that meets these standards. However, Franchisee may use any pharmacy dispensing systems it chooses in the operation of the Business.

K.    Use of Claims Switch - The Company may publish standards for claims processing services ("**Claims Switch**"), and make available for sale access to a Claims Switch that meets those standards. Franchisee may, however, use any Claims Switch it chooses in the operation of the Business, but Franchisee acknowledges that if it does not use the Claims Switch that meets the Company's standards, Franchisee may not be able to participate in marketing or other programs, if any, that require it to provide dispensing information.

L.    Communications and Communications Lines - Franchisee shall at all times use a computer in the operation of the Business which has Internet access. Franchisee shall also install and maintain adequate telephone lines or other communications connectivity, as may be specified by the Company. All communications between the Company and Franchisee shall be in the form and manner determined from time to time by the Company, and Franchisee specifically consents to receipt of communications from the Company by fax, email, or other means of communications.

M.    Taxes and Trade Payables - Franchisee shall promptly discharge all applicable tax liabilities and trade payables when due.

N.    Web Sites - Franchisee shall not establish any web site, or other presence, site or location on the World Wide Web or successor technology, except pursuant to the Company's specific requirements and guidelines, which requirements and guidelines may be modified from time to time.

O.    Local Advertising - Franchisee is expected to promote its business through local advertising, including local newspaper, radio, and television advertising. Franchisee is not required to account to the Company with respect to its expenditures for local advertising, but all local advertising undertaken by Franchisee must comply with the Company's specific guidelines and requirements, as amended from time to time.

## SECTION III - FEES

A.    <u>Initial Fees</u> - Franchisee shall not be required to pay any initial or origination fees to the Company in connection with the execution of this Agreement.

B.    <u>Continuing License Fees</u> - Franchisee shall pay to the Company a monthly continuing license fee of Four Hundred Ninety-nine Dollars ($499) per month. The Company may increase the amount of the continuing license fee, on November 1 of each year, beginning November 1, 2010, to reflect inflation according to the changes in the Consumer Price Index -- All Items 1982-84 = 100 (the "**Index**") published by the Bureau of Labor Statistics, U.S. Department of Labor, or its successors, or in the event the Index is no longer published, by any other comparable instrumentality the Company selects of tracking inflation in the United States. The increase shall be based on the increase in the Index for the most recent twelve (12) months ended August 31 of each year, and such increase will take effect on November 1. This fee is due within thirty (30) days of the date of the monthly invoice for such fees issued by or on behalf of the Company. Franchisee must also pay the full amount of the continuing license fee for the last month of the term of this Agreement, regardless of the actual expiration or termination date of this Agreement. Franchisee shall also pay all excise, use and other taxes (excluding any taxes imposed on the net income of the Company or franchise taxes) imposed on any fees payable to the Company or its affiliates. Notwithstanding any of the foregoing, if this Agreement is being signed in connection with the transfer of an existing Business that was operated under a franchise agreement or franchise license agreement with the Company, the continuing license fee shall be the continuing license fee set forth in the franchise agreement or franchise license agreement that existed for the Business prior to such transfer. Further, if such prior franchise agreement or franchise license agreement was entered into prior to March 1, 2009, then all reporting requirements imposed upon Franchisee under such agreement, and all audit rights of the Company under such agreement, shall be incorporated into this Agreement, and shall be binding on the parties under this Agreement.

C.    <u>Late Payment of Fees</u> - All amounts due to the Company from Franchisee under this Agreement not received by the Company on or before the due date will incur a service charge of one and one-half percent (1½%) per month.

D.    <u>Offset</u> - The Company shall have the right to set-off any amounts owed by Franchisee to the Company or its affiliates against amounts the Company may have received from others for the account of Franchisee or against moneys otherwise owing by the Company to Franchisee. Franchisee specifically consents to the Company retaining any moneys it may be holding for Franchisee or may owe Franchisee to pay outstanding amounts owed by Franchisee to the Company. If any such set-off is taken, the Company may apply the payments in any manner it elects, provided Franchisee receives full credit for the set-off amounts against amounts owing by Franchisee to the Company or its affiliates. Likewise, if Franchisee fails to pay all amounts owing to the Company on any given date, the Company shall have the right to apply any payments made by Franchisee in any manner it elects, notwithstanding any alternate designation by Franchisee.

## SECTION IV - STANDARDS

  A. <u>Policies and Procedures</u> - If the Company establishes policies and procedures for the operation of the Business, the Company shall provide to Franchisee copies of its policies and procedures. These policies and procedures may be provided in a manual, in bulletins, through the Internet, or by any other means determined by the Company. Franchisee agrees to operate the Business in conformance with all mandatory policies and procedures. If they are provided in a manual, the manual shall be kept in safekeeping and in the custody of Franchisee at the premises of the Business, shall remain the property of the Company, and shall not be copied in whole or in part. Franchisee acknowledges that any policies and procedures adopted by the Company are designed to protect the System and the Marks, and not to control the day-to-day operation of the Business. Franchisee will correct any nonconformance with the policies and procedures within thirty (30) days after receiving written notice of such nonconformance by the Company.

  B. <u>Modifications</u> - Franchisee understands and agrees that the System may be modified and improved in the future, and that such modifications may require changes from time to time in the manner in which the Business is operated. Franchisee covenants to conduct its business in strict conformance with any future modification in or amendments to its mandatory policies and procedures, provided that such changes are distributed to all other pharmacy franchisees.

  C. <u>Professional Standards</u> - Notwithstanding the Company's right to require Franchisee to conduct business at the Business in accordance with the System, and the standards set from time to time by the Company, the Company and Franchisee recognize that the practice of pharmacy is a profession requiring independent judgment, skill and training and is governed by federal, state and local laws and regulations. Any inconsistency between the standards of the System or the advice of the Company, on the one hand, and any legal requirement, on the other hand, is inadvertent and not an effort to cause Franchisee to deviate from such legal requirements or the proper practice of its profession. Therefore, the Company and Franchisee understand and agree that (i) in all cases, lawful, regulatory requirements take precedence over both any inconsistent advice, counsel or other guidance offered by the Company as well as any inconsistent standards the Company may prescribe; (ii) no business advice given by the Company nor any standard the Company prescribes or recommends shall be taken as advice in respect of the practice of the profession of pharmacy, as defined by law; (iii) Franchisee's judgment, and the judgment of its registered pharmacists, govern in all matters pertaining to the compounding and dispensing of medications, the advising of patients, communications with physicians on professional matters, and each and every aspect of the professional practice of pharmacies; (iv) in any case in which Franchisee believes that the Company's advice or standards contravene the practice of the profession of pharmacy or any legal requirements of that practice, Franchisee will notify the Company, orally and in writing, immediately; and (v) Franchisee and Franchisee's registered pharmacists are solely responsible for the practice of pharmacy in operating the Business and the results of that practice.

## SECTION V - THE COMPANY'S ASSISTANCE

A.    Pre-Opening Assistance - Franchisee acknowledges that the Company has not represented that it will provide any pre-opening assistance to Franchisee, and the Company is not obligated to provide any such assistance.

B.    Marketing Assistance - The Company will, from time to time, provide to Franchisee such marketing assistance that it deems appropriate, but which assistance shall include access to advertising templates for the creation of advertising, and a Business website customizable with the Business local information.

C.    Specialized Care Center - The Company will allow Franchisee to select one specialized care center among those being offered by the Company or its affiliate at any given time and to add such specialized care center to the Business without the payment of any additional fees to the Company or its affiliate; provided, however that Franchisee sign a separate agreement for such specialized care center in the form required by the Company or its affiliate.D.
      Additional Assistance - The Company may, from time to time, in its discretion make available to Franchisee the opportunity to participate in additional franchise programs, such as business consulting services, local marketing assistance and event planning, mobile solutions, interactive outbound calling systems, suggested pricing programs and specialized care centers. In some cases, such additional assistance may require the execution of a separate agreement by Franchisee, and the payment of additional fees. Franchisee shall not, however, be required to participate in any additional programs that require the payment of additional fees to the Company or its affiliates.

E.    Nature of Assistance - Franchisee acknowledges that the Company is not required to provide any assistance to Franchisee's level of satisfaction, but as a function of its experience, knowledge and judgment. Further, the Company is not obligated to provide any services that are not set forth in this Agreement. In addition, the Company has the right to delegate its responsibilities, and may provide some services through affiliates and others who provide similar services to others, including services offered under other pharmacy network programs.

## SECTION VI - TERMINATION AND PRE-TERMINATION OPTIONS

A.    Termination by Franchisee - Franchisee may terminate this Agreement, with or without cause, upon ninety (90) days prior written notice to the Company; provided, however, that (i) such termination shall not be effective if Franchisee does not comply with all of its post-termination obligations as set forth in Section VII of this Agreement and (ii) if this Agreement is being signed in connection with the transfer of an existing Business that was operated under a franchise agreement or franchise license agreement with the Company entered into prior to March 1, 2009, this Section VI A. shall be excised from this Agreement, and Franchisee shall not have any right to terminate this Agreement prior to expiration of its term.

B.    Termination by the Company - The Company may terminate this Agreement, with or without cause, upon ninety (90) days prior written notice to Franchisee. In addition, the Company may terminate this Agreement upon the occurrence of any of the following events,

each of which shall be considered a breach by Franchisee of its obligations under this Agreement:

(01)    The revocation of Franchisee's pharmacy business license or any controlled substance license;

(02)    If Franchisee discontinues its business operation as a pharmacy for more than five (5) consecutive days, or any shorter period after which it is not unreasonable under the facts and circumstances for the Company to conclude that Franchisee does not intend to operate the Business, unless the failure to operate is due to fire, flood, earthquake or another act of God beyond Franchisee's control.  If such an act of God occurs, Franchisee shall use its best efforts to reopen the Business as soon as possible thereafter; provided, however, if the Business fails to reopen within ninety (90) days of the discontinuance of business operations as a result of one of these events, the Company may terminate this Agreement on the expiration of the ninety (90) days, without further notice to Franchisee;

(03)    The failure of Franchisee to timely provide any reports or other information due to the Company;

(04)    Failure to be regularly open for business not less than the minimum hours prescribed from time to time by the Company;

(05)    Any other conduct that endangers patients or employees of the Business or demonstrates bad faith, improper, fraudulent, or dishonest dealings;

(06)    Franchisee sells or leases the business or a substantial portion of the assets or records of the Business (including patient records), including disposition of fifty percent (50%) or more of voting or membership rights of a corporation, limited liability company or partnership interest having policy control, without first having obtained the approval of the Company to such sale or lease (which approval the Company will not provide unless the sale or assignment complies with the provisions of Section VIII of this Agreement);

(07)    Franchisee surrenders or otherwise transfers control of the operation of the Business without the Company's prior written consent;

(08)    Franchisee breaches any of the provisions of this Agreement or any other agreement between Franchisee and the Company or its affiliates;

(09)    Franchisee fails to pay when due monies owed to creditors of the Business, including the Company and its affiliates;

(10)    Franchisee has filed against it any regulatory, administrative or criminal complaint which the Company reasonably believes affects the goodwill associated with the Marks;

(11)    Franchisee fails to cure within 24 hours after notice from the Company any default which the Company reasonably believes affects the goodwill associated with the Marks; or

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 23 3:06 PM-21CV005832

(12)   Franchisee fails to commence operation of the Business within ninety (90) days after the grant of the License hereunder.

Franchisee shall have the right, within a period of ten (10) days, to cure any default or defaults described in paragraphs (03), (04), (08), or (09) above, and if such default is cured by Franchisee within such ten (10) day period, dating from the date such notice is deemed to be delivered to Franchisee, the Company shall not have the right to terminate this Agreement. However, if there is a second or subsequent default of such paragraph within twelve (12) months of the date the first default occurs, and unless a specific state statute applicable to this Agreement and the relationship between the Company and Franchisee requires otherwise, the Company shall not be required to provide any opportunity to Franchisee to cure the second or subsequent default, and the Company may terminate this Agreement upon notice to Franchisee. To the extent, however, that the provisions of this Agreement with respect to termination or nonrenewal provide for periods of notice less than those required by applicable state law in the state in which the Business is located, or provide for termination, cancellation, nonrenewal, or the like other than in accordance with such applicable law, such provisions shall, to the extent they are not in accordance with applicable law, be superseded by said law, and the Company shall comply with such applicable law in connection with each of these matters.

C.   The Company's Pre-Termination Options - Prior to the termination of this Agreement, if Franchisee fails to pay any amounts owed to the Company or its affiliates, or fails to comply with any material term of this Agreement, then in addition to any right the Company may have to terminate this Agreement or to bring a claim for damages, the Company shall also have the option to suspend all services provided to Franchisee under this Agreement or otherwise, including the sale of products and supplies by the Company or its affiliates.

The Company's actions as outlined in this paragraph may continue until Franchisee has brought its accounts current, cured any default, and complied with the Company's requirements, and the Company has acknowledged the same in writing. Franchisee acknowledges that such actions would not deprive Franchisee of the majority of the material benefits provided for under this Agreement, and would not constitute a constructive termination of this Agreement. Therefore, the taking of any of the actions permitted in this paragraph shall not suspend or release Franchisee from any obligation that would otherwise be owed to the Company or its affiliates under the terms of this Agreement.

## SECTION VII - ACTIONS UPON TERMINATION

A.   Franchisee De-Identification - Upon expiration or termination of this Agreement, or upon assignment of this Agreement by Franchisee, Franchisee shall (i) discontinue immediately the operation of the Business using any of the Marks, including the Primary Mark, or any name or mark similar to any of the Marks, or any portion of the System; (ii) discontinue immediately advertising or identifying the Business using any of the Marks, including the Primary Mark, any of the words or phrases identified in the Rider as "Confusingly Similar" names, any words, phrases or symbols that are likely to be confused with any of the Marks, including the Primary Marks, or any words, phrases or symbols that are reproductions, counterfeits, copies or colorable imitations of any of the Marks, including the Primary Mark, or

any portion of the System; (iii) discontinue the sale of any products in the Business that bear any private label owned or licensed by the Company, (iv) cause to be made immediately such reasonable and necessary changes to establish effectively to the public that the Business is no longer a member of the Franchised Network, (v) immediately discontinue using any software and other items proprietary to the Company; (vi) immediately return to the Company all manuals and other proprietary materials that have been loaned to Franchisee under this Agreement; and (vii) immediately delete from Franchisee's computer and other records any software provided, loaned or licensed to Franchisee by the Company or the Company's designees and all advertising and promotional materials, price lists, supplier information, bulletins, memos, manuals, and other proprietary items transmitted to Franchisee by the Company by email, Internet or intra-net transmission, or by any other technological means. If Franchisee fails to comply forthwith, the Company may make or cause to be made such changes at the expense of Franchisee, which expenses shall be paid by Franchisee on demand. Franchisee shall also promptly pay to the Company and any of its affiliates any and all amounts due and owing to Company or its affiliates at the time of termination and all unpaid continuing license fees invoiced either before or after the date of termination which are payable with respect to any month or partial month during which Franchisee operated the Business prior to termination.

B.  Cancellation of Listings - Upon expiration or termination of this Agreement, or upon assignment of this Agreement by Franchisee, Franchisee shall promptly take such action as may be required to properly cancel all domain names and any assumed name or equivalent registrations relating to the use of the Marks, or any part thereof, and direct and authorize any internet service provider, domain name registrar and all listing agencies to transfer all domain names and listings for or used by the Business to any other entity designated by the Company, or to completely discontinue the use thereof upon the Company's direction; and Franchisee appoints the Company as its attorney-in-fact to make such changes in the event of Franchisee's failure so to do. Franchisee acknowledges that, as between the Company and Franchisee, the Company has the sole right to and interest in all domain names associated with the Marks. Franchisee further acknowledges that Franchisee's right to use any website or page provided to Franchisee by the Company shall terminate upon termination, expiration or assignment of this Agreement.

## SECTION VIII - ASSIGNMENT

A.  Franchisee Assignment - For purposes of this Section VIII, the term "**Assignment**" shall mean (i) the sale, lease or transfer of an interest in the License, the Business, or any substantial portion of the assets of the Business,including but not limited to sales or transfers of inventory outside the ordinary course of business, and sales or transfers of fixtures, patient records, or any business records of the Business, and (ii) if Franchisee is a partnership, limited liability company, corporation, or similar entity, an offer to purchase such percentage of interest of such entity as would constitute an aggregate change of fifty percent (50%) or more of the ownership of such entity as of the date of this Agreement. Franchisee shall not conclude any Assignment without the prior written consent of the Company, which consent shall not be unreasonably withheld if the following conditions and requirements are first satisfied:

(01)  The transferee shall be of good moral character and reputation and shall have a good credit rating, financial capabilities, and competent business qualifications

Case 8:21-cv-01910-SDM-CPT Document 1-8 Filed 08/09/21 Page 30 of 64 PageID 634

acceptable to the Company. The Company shall have approved the material terms and conditions of such transfer and determined that the price and terms will not adversely affect the transferee's operation of the Business (but such approval shall not be considered a representation to anyone that such is the case). Franchisee shall provide the Company with such information and documents as it may reasonably require to make a determination concerning each proposed transfer and transferee;

(02)     The transferee, at its expense, shall agree to attend any training programs mandated by the Company (but the Company shall not impose any separate charges for attending this training);

(03)     The transferee shall sign a new franchise agreement with the Company, in the form then being used by the Company, payment and performance under which shall be personally guaranteed by all shareholders, members or partners of the transferee; provided, however, that the transferee shall not be required to pay any initial fee in connection with such agreement and any pre-opening obligations of the Company shall be waived;

(04)     All accrued money obligations of Franchisee to the Company shall be satisfied prior to the assignment or transfer;

(05)     Franchisee or the transferee shall complete, or agree to complete, any cleaning, repair, remodeling, upgrading, painting or decoration of the Business required by the Company;

(06)     Franchisee shall execute a general release, in form required by the Company, of any and all claims against the Company and its affiliates, including their respective officers, directors, employees and agents;

(07)     Franchisee shall pay to the Company a transfer fee of One Thousand Dollars ($1,000);

(08)     If the transferee already owns one or more pharmacies operated under franchises or licenses granted by the Company or its affiliates, it shall be in full compliance with all agreements it has with the Company or its affiliates with respect thereto; and

(09)     Franchisee shall have entered into an agreement with the Company providing that all obligations of the transferee to make installment payments of the purchase price or interest thereon to Franchisee or to any of its owners shall be subordinate to the obligations of the transferee to comply with all of its obligations to the Company and its affiliates.

Clauses (03) and (07) of this Paragraph A shall not apply to an Assignment to a corporation or limited liability company wholly owned by Franchisee, or to any stock or membership transfer among or between the individuals listed as Franchisee on the first page of this Agreement, provided that if the transfer is to a corporation or limited liability company, Franchisee must execute forms acceptable to the Company guaranteeing the obligations of the

transferee and agreeing to remain personally bound by all confidentiality provisions of this Agreement.

Upon the death or permanent disability (as defined below) of Franchisee (or, in the case of a partnership, limited liability company or corporation, by the death or incapacity of one owning a majority of the voting interest of Franchisee), Franchisee's heir or personal representative must assign, transfer, or sell its interest in the License to a transferee who is permitted by law to own the Business and who complies with the remaining provisions of this Paragraph A. If a transfer or assignment of the License is not made by the heir or personal representative within one hundred eighty (180) days after the death or incapacity of Franchisee, the heir or personal representative must comply with all the provisions of this Paragraph A or the License will be deemed to have been transferred this Agreement in an unauthorized manner. For purposes of this paragraph, the term "**permanent disability**" shall mean a mental or physical disability, impairment or condition as reasonably expected to prevent Franchisee (or, in the case of a partnership, limited liability company or corporation, a person owning a majority of the voting interest of Franchisee) from managing and supervising the Business for a period of more than one hundred twenty (120) days from the onset of such disability, impairment or condition.

B.  The Company's Assignment - This Agreement is fully assignable by the Company and shall inure to the benefit of any assignee or other legal successor to the interest of the Company.

## SECTION IX- INTELLECTUAL PROPERTY

A.  Confidentiality - The System, and the Company's methods of operation are valuable trade secrets, and Franchisee covenants not to reveal any portion thereof, or use any portion thereof, in any other business. Such information includes, but is not limited to, details as to the contents of the Company's manuals, third party reimbursement plans, and computer software and point of sale systems.

B.  Use of Marks - Franchisee shall operate under, and prominently display, the Marks in the operation of the Business. Franchisee shall use and display only the exterior sign or signs that meet specifications established by the Company; provided, however, that while Franchisee is generally expected to use the Primary Mark to identify the Business, if Franchisee has been operating the Business as a pharmacy prior to the date of this Agreement, the Company will allow Franchisee to use its existing trade name as the principal name of the Business, provided that Franchisee uses the Primary Mark as an additional identifier of the Business, in a manner approved by the Company.

(01)  Franchisee agrees that if for any reason it becomes necessary or desirable for the Company to cease use of any of the Marks (including the Primary Mark) or other identifying indicia (in whole or in part), the Company shall have the right to substitute such mark or other identifying indicia as it deems necessary or desirable, and such substitution shall not affect the validity of this Agreement which shall, in all respects, be deemed modified to provide for such substitution. If any of the Marks are changed (including the Primary Mark), Franchisee shall be responsible for all costs it incurs at the premises of the Business to change all signs and other materials identifying the Business.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 23 2:06 PM-21CV005836

(02)  Franchisee shall use no commercial trade name, service mark or other commercial symbol, including associate logos, that does not satisfy the criteria established by the Company. Franchisee acknowledges that its right to use the Marks is derived solely from this Agreement and that all such use and any goodwill established thereby shall inure to the exclusive benefit of the Company. Franchisee shall not use any of the Marks, or any parts thereof, in the name of the corporation, limited liability company or partnership involved in the operation of the Business, or as part of a web site address.

C.  <u>Information Concerning the Business</u> - Franchisee acknowledges that any information concerning the operation of the Business that it provides to the Company, including information as to patients of the Business, may be used by the Company and/or its affiliates in connection with the operation of its/their business, but that such information will be used in compliance with the duties and requirements set forth in all applicable laws, rules and regulations which govern the practice of pharmacy and all general privacy laws, including any laws limiting the sale or disclosure of such information to others.

SECTION X - INSURANCE/INDEMNIFICATION

A.  <u>Insurance</u> - At all times during the term of this Agreement, Franchisee shall maintain in force, at its sole expense, general comprehensive public liability insurance against claims for bodily and personal injury, death and property damage caused by, or incurred in conjunction with, the operation of, or conduct of business by, Franchisee; general casualty insurance (including the perils of fire, broad form extended coverage, vandalism, and malicious mischief) on the Business's building, equipment, signs, and inventory; workers' compensation insurance; and, if any motor vehicles are owned by the business, motor vehicle liability insurance. The insurance coverage shall be maintained under one or more policies of insurance containing the amounts and types of coverage from time to time described by the Company and insured by insurance companies acceptable to the Company. All liability insurance policies shall name the Company as an additional insured and shall provide that the Company receive ten (10) days' prior written notice of termination, expiration, reduction, or cancellation of any such policy. Franchisee shall submit annually to the Company a copy of the certificate or other evidence of the renewal or extension of each such insurance policy. If Franchisee at any time fails or refuses to maintain any insurance coverage required by the Company, or fails to furnish satisfactory evidence thereof, the Company, at its option, in addition to its other remedies and rights hereunder, may obtain such insurance coverage on behalf of Franchisee, and any costs of premiums incurred by the Company in connection therewith shall be paid by Franchisee on demand.

B.  <u>Indemnification</u> - Neither the Company nor Franchisee shall be obligated by any agreement, representation, or warranty (except warranties specifically authorized by the Company, if any) made by the other, nor shall the Company be obligated for damages to any person or property directly or indirectly arising out of the operation of the Business, or caused by Franchisee's negligence, willful action, or failure to act. Franchisee agrees to indemnify and defend the Company in any action, suit, proceedings, demand, investigation, or inquiry (formal or informal) wherein the liability of the Company is alleged or in which it is named as a party as a result of (i) any action the Company is authorized to take under this Agreement on behalf of Franchisee, or (ii) actions by Franchisee, or activities occurring on the premises of the Business,

except to the extent such actions or activities were taken by Franchisee under the specific direction of the Company, whether required in this Agreement, in the Company's policies and procedures, or in any written directive from the Company to Franchisee. In the event such an action or claim is made against the Company, Franchisee shall indemnify and hold harmless the Company from all costs (including without limitation, reasonable attorneys' fees, costs of investigation or proof of facts, court costs, other litigation expenses, and travel and living expenses), and from all amounts paid or incurred by the Company arising out of such action or claim. The Company shall have the right to defend any such claim against it. Such an undertaking by the Company shall, in no manner or form, diminish Franchisee's obligation to indemnify the Company and to hold it harmless. The Company shall not be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. The indemnities and assumption of liabilities and obligations herein shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## SECTION XI – INDEPENDENT CONTRACTOR

Franchisee is and shall be considered an independent contractor with entire control and direction of its business and operation, subject only to the conditions and obligations established by this Agreement. Franchisee shall conspicuously identify itself on the premises of the Business as a licensee of the Company. No agency, employment, or partnership is created by this Agreement. Franchisee's business is separate and apart from any that may be operated by the Company. Except to the extent the Company is specifically authorized under this Agreement to act as attorney-in-fact for Franchisee, neither party to this Agreement will have authority to act for the other in any manner, or to create obligations or debts binding on the others, and neither party will be responsible for any obligations or expenses whatsoever of the other.

## SECTION XII - ENFORCEMENT

A.     Waivers - The failure, neglect, or delay of either party to enforce or exercise its rights under this Agreement or under any applicable law or regulation shall not constitute a waiver or diminish such party's right to strictly enforce the provisions of this Agreement or such law or regulation; provided, however, that failure, neglect, or delay to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations under this Agreement or under state or federal laws or regulations, shall constitute a waiver of any default arising under this Agreement or under state or federal law and shall preclude exercise or enforcement of any right or remedy arising therefrom unless written notice of such default is provided by the nondefaulting party to the other party within eighteen (18) months after such right or default occurs.

B.     Governing Law - Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act; 15 U.S.C. § 1050 et seq., as amended), this Agreement and the construction thereof shall be governed by the laws of the State of Ohio.

C.     Venue - Each party agrees to submit to the exclusive jurisdiction of the state and federal courts of Ohio, located in Franklin County, Ohio, with respect to any dispute concerning this Agreement or the rights and obligations of the parties under this Agreement. Except as set

forth in the last sentence of this Paragraph, no litigation involving this Agreement or any aspect of the relationship between the parties or their agents or affiliates shall be commenced by any party except in the foregoing courts, nor shall any action commenced in the state courts of Ohio, be removed or transferred to any court other than the Federal District Court, Sixth Circuit, Ohio Southern District, and each of the parties consents to jurisdiction in such court. Notwithstanding the foregoing, the Company may, at its option, seek injunctive relief against Franchisee in the county in which the Business is located.

D.    Legal Fees - If Franchisee breaches any of its obligations under this Agreement, it shall reimburse the Company for any legal fees the Company incurs in either enforcing Franchisee's obligations, or in seeking redress for such breach.

E.    Waiver of Punitive Damages - If any litigation is commenced in relation to this Agreement or the relationship of the parties created under this Agreement, the Company and Franchisee (and the respective owners and guarantors if applicable) agree to waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against the other, and against any affiliates, owners, employees, or agents of the other, and agree that in the event of a dispute between or among any of them, each shall be limited in the recovery of any damages to recovery of the actual damages sustained by it.

F.    Waiver of Jury Trial - IF ANY LITIGATION IS COMMENCED IN RELATION TO THIS AGREEMENT, OR THE RELATIONSHIP OF THE PARTIES CREATED UNDER THIS AGREEMENT (EVEN IF OTHER PARTIES ARE INCLUDED IN SUCH LITIGATION), EACH OF THE PARTIES WAIVES ITS RIGHT TO A JURY TRIAL. THIS WAIVER SHALL APPLY TO ALL CAUSES OF ACTION THAT ARE OR MIGHT BE INCLUDED IN SUCH ACTION, INCLUDING BUT NOT LIMITED TO CLAIMS RELATED TO THE ENFORCEMENT OR INTERPRETATION OF THIS AGREEMENT, ALLEGATIONS OF STATE OR FEDERAL STATUTORY VIOLATIONS, FRAUD, MISREPRESENTATION, OR OTHER CAUSES OF ACTION, AND IN CONNECTION WITH ANY LEGAL ACTION INITIATED FOR THE RECOVERY OF DAMAGES BETWEEN THE COMPANY AND FRANCHISEE (INCLUDING ANY OWNERS OR GUARANTORS, IF APPLICABLE, AND INCLUDING ACTIONS INVOLVING AFFILIATES, EMPLOYEES, OR AGENTS OF THE COMPANY OR FRANCHISEE).

G.    Waiver of Collateral Estoppel - The parties agree they should each be able to settle, mediate, litigate, arbitrate, or compromise disputes in which they are involved with third parties, without having the disposition of such disputes directly affect the contract or relationship between the Company and Franchisee. The Company and Franchisee therefore each agree that a decision of an arbitrator or court of law in litigation to which one of them is not a party shall not in any manner prevent the person that was a party to such action from making similar arguments, or taking similar positions, in any action between the Company and Franchisee. The parties therefore waive the right to assert that principles of collateral estoppel prevent either of them from raising any claim or defense in an action between them as a result of such party having lost a similar claim or defense in another action.

H.    Joint and Several Liability - If Franchisee forms a corporation, limited liability company, or limited partnership to operate the Business, such entity shall be considered jointly

and severally liable with Franchisee for performance of the obligations of Franchisee under this Agreement to the same extent as if such entity had been a signator to this Agreement as Franchisee, and by accepting the use of the Marks in connection with the operation of its pharmacy, such entity shall be estopped from claiming that it is not jointly and severally liable for the obligations of Franchisee under this Agreement.

## SECTION XIII – TERM

A.     Term - This Agreement shall become effective as of the date hereof and shall expire five (5) years after the date of this Agreement. Notwithstanding the foregoing, if this Agreement is being signed in connection with the transfer of an existing Business that was operated under a franchise agreement or franchise license agreement with the Company, the term of this Agreement shall expire on the date that the previous franchise agreement or franchise license agreement would have expired.

B.     No Renewal Rights - Franchisee shall not have any right to renew this agreement upon expiration. However, if Franchisee has complied with all of the terms and conditions of this Agreement and has substantially complied with the operating standards and criteria established for pharmacies operating under the Primary Mark, then at the expiration of this Agreement, the Company shall offer Franchisee the opportunity to remain a franchisee for one (1) additional period of five (5) years, provided that:

(01)   Franchisee shall give the Company written notice of its intent to exercise this option to continue as a franchisee not less than six (6) months prior to the expiration of the term of this Agreement.

(02)   Franchisee shall agree to make such capital expenditures as may be reasonably required by the Company to renovate and modernize its building, premises, signs, and equipment so as to reflect the then current image of the System.

(03)   Franchisee shall execute a new franchise agreement on the form then being used by the Company in the grant of new franchises to use the Marks. The terms of any such agreement may be significantly different than the terms set forth in this Agreement. Franchisee acknowledges, however, that the initial term of this Agreement, without any right of renewal, provides Franchisee more than a sufficient opportunity to recoup its investment in the License, as well as a reasonable return of that investment. Failure of Franchisee to execute that agreement within thirty (30) days after receipt shall be deemed an election not to continue as a licensee or franchisee following expiration of this Agreement.

The Company shall give Franchisee notice at least ninety (90) days prior to the expiration of the License if the Company intends to not permit Franchisee to continue as a licensee or franchisee of the Company due to Franchisee's failure to meet any of the foregoing conditions.

## SECTION XIV – MISCELLANEOUS

A.     Entire Agreement - This Agreement contains the entire agreement of the parties and supersedes any oral or written representations (except for or other than those contained in the

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 26 3:06 PM-21CV005840

Franchise Disclosure Document which Franchisee acknowledges receiving at least fourteen (14) calendar days prior to Franchisee's execution of this Agreement or the payment of any monies due to the Company in connection with this Agreement), inducements, or promises not contained herein and may not be modified except in writing signed by the party against whom enforcement is sought. Without limiting the foregoing, the Company expressly disclaims the making of, and Franchisee acknowledges that it has not received or relied upon, any warranty or guaranty, expressed or implied, as to the potential or probable revenues, profits or success of the Business.

B.      Binding Effect - This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company and upon the permitted successors, executors, or other personal representatives of Franchisee. Expiration or lapse of time or earlier termination of this Agreement shall not affect continuing covenants, duties, and obligations contained herein, nor the indemnity provided in Section X of this Agreement.

C.      Time - Time is of the essence of this Agreement.

D.      Consent to Communications - Each of the parties consents to receive communications sent by or behalf of the other, or by or on behalf of any affiliates of the other, via regular mail, email, overnight mail, personal delivery, telephone, fax or other means; provided, however, that formal notices shall only be considered effective when delivered in accordance with the provisions of Paragraph G of this Section XIV.

E.      Headings - All headings and titles contained in this Agreement are for reference only and shall not be considered a part of this Agreement.

F.      The Company's Business Interests - Franchisee acknowledges that the Company and its affiliates have their own business interests that are not intended to be restricted by this Agreement. Except as expressly provided in this Agreement, the Company and its affiliates may pursue their own business interests without obligation to, and irrespective of, the impact of its actions upon Franchisee or the Business. These actions include, but not by way of limitation, ownership, operation or disposition of its own pharmacies or other businesses, whether or not similar to or compatible with the Business, and the sale of products (including pharmaceutical products) through other methods of distribution.

G.      Notices - All notices required or permitted to be given under this Agreement shall be deemed effective when delivered by hand, when sent by facsimile, one (1) business day after sent by a national overnight courier for next business delivery, or four (4) days after placed in the United States mail by registered or certified mail, postage prepaid. In all cases in which notices are sent by facsimile, they must be sent, in the case of a notice to Franchisee, to a facsimile machine located in the Business, and in the case of a facsimile to the Company, to the principal facsimile number used by the Company for the receipt of facsimile transmissions. In all other cases in which delivery is made other than by personal delivery, delivery shall be deemed to be completed at the time indicated above when the notice is addressed to Franchisee at the principal location of the Business, or any other address provided to the Company by Franchisee prior to the opening of the Business or to the Company at its principal business address, or at such other address of which the notifying party has been notified.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2022 Aug 23 2:16 PM-21CV005468

## RIDER TO FRANCHISE AGREEMENT

The Company: Medicine Shoppe International, Inc., a Delaware corporation

Primary Mark: The Medicine Shoppe®

Confusingly Similar Names: Medicine, Med, Medi, Shop, Shoppe, Store

Location: 1144 Airport Drive, Alexander City, Alabama 35010

IN WITNESS WHEREOF, the parties have executed this Agreement, to become effective as of the date listed on the first page of this Agreement.

FRANCHISEE:
CGM, INC., an Alabama corporation

By: _____

Name: Sherry D Richardson

Title (if an entity): President GGM Inc
Executed on: 7-1-09

1237974.2

THE COMPANY:
MEDICINE SHOPPE
INTERNATIONAL, INC., a
Delaware corporation

By: _____

Name: _____
Title: _____
Executed on: 7/20/09

FA – Rider

## GUARANTY

IN CONSIDERATION for, and as an inducement for MEDICINE SHOPPE INTERNATIONAL, INC. (the "**Company**") to enter into the Franchise Agreement to which this Guaranty is attached (the "**Franchise Agreement**"), the undersigned hereby jointly and severally guarantee to the Company and to the Company's successors and assigns the payment of all fees required to be paid to the Company or its affiliates by Franchisee identified in the Franchise Agreement, whether provided for in the Franchise Agreement or under any other agreement between the Company and Franchisee, and the performance by Franchisee of all of the provisions of such agreements. The undersigned further specifically agree to be individually bound by all covenants, obligations and commitments of Franchisee contained in the Franchise Agreement to the same extent as if each of the undersigned had individually executed the Franchise Agreement as Franchisee.

The undersigned understand and agree that any modification of the Franchise Agreement, including any addendum or addenda thereto, or waiver by the Company of the performance by Franchisee of its obligations thereunder, or the giving by the Company of any extension of time for the performance of any of the obligations of Franchisee thereunder, or any other forbearance on the part of the Company or any failure by the Company to enforce any of its rights under the Franchise Agreement, including any addendum or addenda thereto, shall not in any way release the undersigned from liability hereunder or terminate, affect or diminish the validity of this Guaranty, except to the same extent, but only to such extent, that the liability or obligation of Franchisee is so released, terminated, or affected or diminished. Notice to the undersigned of any such modification, waiver, extension or forbearance under the terms thereof is hereby waived. This Guaranty shall be enforceable upon ten (10) days' written notice by the Company to any of the undersigned of any default by Franchisee of any of its covenants under the terms of the Franchise Agreement and addendum or addenda thereto, and any other agreement between the Company and Franchisee.

The undersigned hereby waive any and all notice of default on the part of Franchisee; waive exhausting of recourse against Franchisee; and consent to any assignment of the Franchise Agreement, in whole or in part, that the Company or its successors may make.

Dated: 7/1/09

John E. Richardson, Jr.

Dated: 7/1/09

Sherry D. Richardson

1237974.2

LEGACY FRANCHISE ADDENDUM
TO FRANCHISE AGREEMENT (the "Franchise Agreement")
BY AND BETWEEN MEDICINE SHOPPE INTERNATIONAL, INC. (the "Company")
and CGM, INC. ( "Franchisee")
DATED July 1, 2009

Franchisee and the Company have entered into a franchise agreement (the "**Franchise Agreement**") for the operation by Franchisee of a retail pharmacy store (the "**Business**") at the location identified in the Rider to the Franchise Agreement. Prior to entering into the Franchise Agreement, Franchisee has been operating the Business pursuant to that certain Franchise License Agreement by and between Franchisee and the Company (the "**Old Franchise Agreement**"). The parties agree that the Franchise Agreement shall, subject to the provisions of Paragraph 5 below, in all respects replace the Old Franchise Agreement, which shall be deemed to have been terminated as of the Effective Date (as defined below).

In recognition and consideration of Franchisee entering into the Franchise Agreement as a successor agreement to the Old Franchise Agreement, the Company and the Franchisee hereby agree to amend the Franchise Agreement as follows:

1.      Term. Section XIII.A of the Franchise Agreement is hereby amended to provide that the Term of the Franchise Agreement will commence on July 1, 2009 (or such later date established by the Company for all such previously existing franchise agreements, which shall be set forth in a writing to you) (the "**Effective Date**") and will terminate May 1, 2025.

2.      Termination. Section VI.A, and the first sentence of Section VI.B of the Franchise Agreement, are hereby deleted. The second sentence of Section VI.B is amended by deleting the words "in addition" at the beginning of the sentence such that the sentence begins: "The Company may terminate this Agreement upon the occurrence of any of the following events . . . ."

3.      Business Consulting Services. The Company agrees to provide Franchisee with those certain business consulting services that are available under the business consulting program offered by the Company or its affiliate(s), at no charge to Franchisee for the first two years beginning on the Effective Date. Thereafter, if Franchisee desires to continue to receive such business consulting services, Franchisee agrees to pay the then-current fees for such services being charged by the Company or its affiliate(s) to new franchisees or new customers, and execute any agreements required by the Company in connection with the provision of such services.

4. Cardinal Health-MSI Prime Vendor Agreement:

A.      Requirement to Enter Prime Vendor Agreement. Franchisee shall enter into a Prime Vendor Agreement ("**PVA**") with Cardinal Health 110, Inc. and/or Cardinal Health 411, Inc. (or such other affiliate designated by the Company, and in any case, referred to hereafter as "**Cardinal Health**") for the lesser of five (5) years from the Effective Date or the term of the Franchise Agreement. Upon expiration of the PVA, Franchisee shall continue purchasing its primary requirements of pharmaceutical products from Cardinal Health (i) under an extension of the PVA if mutually agreed by the Franchisee and Cardinal Health, in each party's sole discretion, (ii) under a newly negotiated agreement with Cardinal Health, or (iii) through any retail independent group purchasing organization serviced by Cardinal Health.

B.      Pricing Matrix. The Pricing Matrix under the PVA shall be the same as the Pricing Matrix pursuant to that certain Wholesale Supply Agreement between Medicine Shoppe International, Inc. and Cardinal Health 110, Inc. effective as of October 1, 2005 (as amended, the "**WSA**"), with the following exceptions:

(1)      The system-wide volume incentive under the WSA will be frozen at its current level;

1

(2)     The Franchise Renewal Reduction as defined in the WSA will be eliminated from the PVA;

(3)     If Franchisee would have been eligible for the Franchise Renewal Reduction (i.e. 25 basis points in purchase price of Merchandise) if Franchisee was purchasing from Cardinal Health, Franchisee will receive the Franchise Renewal Reduction under the PVA; and

(4)     If Franchisee owns one or more pharmacies that are not part of the Company's franchise system and Franchisee converts one or more of those pharmacies to the Medicine Shoppe or Medicap Pharmacy system on or before December 31, 2009, then such additional pharmacies will be offered the purchase price under the MSI Pricing Matrix (subject to Cardinal Health's credit, regulatory and other checks);

(5)     Franchisees with more than one pharmacy that is a party to a PVA with Cardinal Health may elect a weighted averaging methodology to determine the applicable purchase price under the Pricing Matrix for all pharmacies, which shall be recalculated periodically in Cardinal Health's discretion;

C.     Pricing Guarantee. With respect to that certain group of franchisees of Medicine Shoppe International, Inc. and Medicap Pharmacies Incorporated (collectively, "MSI") who: (i) were MSI franchisees under an Old Franchise Agreement prior to the Effective Date, (ii) remain MSI franchisees under a new Franchise Agreement with MSI, and (iii) purchase their primary requirements of pharmaceutical products from Cardinal Health under a PVA dated on or after the Effective Date (the "**Applicable Franchisees**"), the Company represents and warrants that the terms and net landed cost of products and services offered to the Applicable Franchisees under their PVAs with Cardinal Health are, collectively, not individually, at least as good as the terms and net landed cost of products and services offered to members of Cardinal Health's three (3) largest retail independent group purchasing organization customers. One time per each consecutive twelve (12) month period following the Effective Date (each, a "**Review Period**"), and following at least thirty (30) days advance written notice to Cardinal Health, the Applicable Franchisees (collectively, not individually) through the Company, may audit Cardinal Health's relevant records applicable to the Applicable Franchisees' purchases from Cardinal Health for the sole purpose of verifying that the terms and net landed cost of products and services offered to the Applicable Franchisees under their PVAs with Cardinal Health are, collectively, not individually, at least as good as the terms and net landed cost of products and services offered to members of Cardinal Health's three (3) largest retail independent group purchasing organization customers. Notwithstanding the foregoing, however, the pricing guarantee set forth above, and the Applicable Franchisees' right to audit the pricing guarantee through the Company, shall be in effect for the longer of five (5) years following the Effective Date or through the last full Review Period in which the number of Applicable Franchisees equaled at least one hundred (100).

5.     Tender Offer. The franchise program offered to Franchisee pursuant to the Franchise Agreement is also being offered to the entire Medicine Shoppe and Medicap Pharmacy franchise systems. In the event that an overwhelming number of franchisees do not convert to this new franchise program, as determined by the Company in its sole discretion, the Company shall have the right to withdraw this offer to Franchisee upon written notice, in which case the offer to sell a franchise pursuant to the terms of the Franchise Agreement shall be withdrawn and of no force and effect, and the Old Franchise Agreement shall remain in effect.

6.     Defined Words/ Effect. Capitalized words not otherwise defined in this Addendum shall have the meaning ascribed to them in the Franchise Agreement or the WSA, as applicable. This Addendum is deemed an attachment to, and is subject to all the terms and conditions of, the Franchise Agreement; however, in the event of a conflict between the terms and provisions of this Addendum and the Franchise Agreement, this Addendum shall control.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 27 3:56 PM-21CV005845

[Signature block on following page]

CGM, INC.

MEDICINE SHOPPE INTERNATIONAL, INC.

By: _____
Its: _____

1242963.1

By: _____
Its: _____

4

# CardinalHealth

**CREDIT APPLICATION**

FOR OFFICE USE ONLY
Code & Territory: ___
Sales Representative Name:___

## Section I - GENERAL INFORMATION

1. APPLICANT'S LEGAL NAME: C GM Inc DBA The Medicine Shoppe # 1868

2. 1144 Airport Drive    Alexander City A1 35010
   APPLICANT'S BUSINESS ADDRESS                        Main Office Phone #                    Main Office Fax #

   SHIPPING ADDRESS (only if different than business address) ___

   BILLING ADDRESS (only if different than business address) ___

## Section II - FINANCIAL INFORMATION

3. BUSINESS TYPE (Check One): Proprietorship ___ Partnership ___ (S) Corp ✓ (C) Corp ___ LLC ___ Other ___

4. Federal Tax I.D. # ___ State I.D. # ___ (This # must correspond with an attached sales tax exemption certificate.) State of Incorporation Alabama

5. LIST ALL OTHER NAMES UNDER WHICH YOU HAVE OPERATED OR ARE CURRENTLY OPERATING (i.e., d/b/a, f/k/a, a/k/a, etc.): None

6. PLEASE LIST ANY AFFILIATED BUSINESSES (include addresses) (Attach extra sheet if necessary): None

7. LIST NAMES OF PROPRIETOR, PARTNERS or OFFICERS OF APPLICANT (Attach extra sheet if necessary).

| Name | Title | % Owned | Home Address | Social Security No. |
|---|---|---|---|---|
| Sherry Richardson | President | 90% | | |
| Jonnie Wilbaut | Secretary | 10% | | |
| | | | | |

8. LIST NAMES AND ADDRESSES OF OTHER HEALTH CARE COMPANIES IN WHICH ANY OF THE INDIVIDUALS OR ORGANIZATIONS LISTED IN QUESTION #7 ABOVE ALSO HAVE AN OWNERSHIP INTEREST (i.e., owner, partner or officer):
   None

| Name of Individual/Company | Name of Affiliated Company | Address of Affiliated Company |
|---|---|---|
| | | |

9. IF YOU ARE PART OF AN OWNERSHIP STRUCTURE, PLEASE LIST, IN ORDER, ALL ENTITIES WITHIN THE CHAIN OF CONTROL OF THE APPLICANT THROUGH THE PARENT ENTITY
   N/A

10. PRIMARY BUSINESS CONTACT Sherry Richardson owner Rph

| Name | Title | Telephone No. | Email Address |
|---|---|---|---|

11. HOW LONG HAS BUSINESS BEEN UNDER PRESENT OWNERSHIP? 2 years    Year Business Started 2006    Number of Employees 7

12. ESTIMATED MONTHLY PURCHASES 230 K    ESTIMATED INITIAL PURCHASE ___    TERMS REQUESTED (subject to credit approval) ___

13. MAJOR SUPPLIERS/EXISTING WHOLESALERS: (Include Name, Address, Phone #, Contact, Account #, High Credit Amount and Amount Owed)
    Cardinal Health

| Supplier | Address | Phone | Contact | Account # | $ High Credit Amount | $ Amount Owed |
|---|---|---|---|---|---|---|
| | | | | | | |

14. NAMES OF BANKS: (Include Account Number, Address & Phone)
    Aliant Bank

| Bank | Account # | Address | Phone # |
|---|---|---|---|

15. IF APPLICANT IS PURCHASING PHARMACEUTICALS FROM CARDINAL HEALTH, ANSWER THE FOLLOWING QUESTION: INDICATE ALL OF THE TYPES OF CUSTOMERS YOU SERVICE AND THAT CUSTOMER'S BUSINESS SHARE:

| TYPES OF CUSTOMER | SHARE % | | SHARE % | | | SHARE % |
|---|---|---|---|---|---|---|
| > ASSISTED LIVING | | > LONG-TERM CARE / NURSING HOMES | 6 | > HOME HEALTH CARE AGENCIES | | |
| > RETAIL PHARMACIES | | > DENTAL OFFICES | | > MANUFACTURERS | | |
| > INDIVIDUAL PATIENTS | 94 | > MAIL ORDER INTERNET PHARMACIES | | > DISTRIBUTORS/ WHOLESALERS | | |
| > PHYSICIAN OFFICES | | > HOSPITALS | | > VETERINARY OFFICES | | |
| | | | | > OUTPATIENT / SURGERY CENTERS | | |
| | | | | > OTHER ___ DESCRIPTION___ | | |

16. WILL GOODS PURCHASED BE RESOLD? YES ☑ NO ☐ If yes, in what form? AS IS ☐ RE-MANUFACTURED ☐ RE-PACKAGED ☐ INTERNATIONALLY ☐ OTHER ___    EXPLAIN
    DRUG LICENSE TYPE* PHYSICIAN ☐ WHOLESALER ☐ PHARMACY ☑ PRECURSOR ☐ DEA ☐ OTHER ___
    *Must provide a copy of your state-issued license and DEA Permit    DEA #

17. ARE THERE CURRENTLY ANY SUITS, LIENS OR JUDGMENTS FILED AGAINST APPLICANT OR ITS BUSINESS, AND/OR HAS APPLICANT OR ITS BUSINESS EVER FILED FOR BANKRUPTCY? YES ☐ NO ☑ If yes, please describe ___

18. TYPE OF BUSINESS OF APPLICANT:

| ACUTE | AMBULATORY (CON'T) | LABORATORY | RETAIL WHOLESALE | OTHER |
|---|---|---|---|---|
| ☐ Hospital | ☐ Outpatient Clinic | ☐ Reference Lab | ☐ Consulting Pharmacy | ☐ Long-Term Care Pharmacy/Nursing Homes |
| ☐ Surgery Center Hospital Affiliated | ☐ Physician Office | ☐ Hospital Laboratory | ☐ Distributor / Wholesaler | ☐ Nursing Home |
| AMBULATORY | ☐ Rehabilitation/Occupational Facility | ☐ Blood/Plasma Lab | ☐ Healthcare Manufacturer | ☐ Cardiac Cath Lab |
| ☐ Assisted Living | ☐ Surgery Center Freestanding | ☐ Clinic/Physician Lab | ☐ Mail Order/Internet Pharmacies | ☐ Diagnostic Imaging Center |
| ☐ Dental Office | ☐ Veterinary Office | ☐ Blood Bank | ☐ OEM Dealer | ☐ Other |
| ☐ Homecare/DME Provider | | | ☑ Retail Pharmacy | |

**EXHIBIT B**

## Section III - AGREEMENT AND DISCLOSURES

1. As an inducement for Cardinal Health* to accept orders from or otherwise extend or make available credit to Applicant, the undersigned Applicant hereby agrees to comply with the following terms of sale, should Cardinal Health elect to extend such credit.

2. Pricing and payment terms are determined at the time an offer is presented to Applicant.

3. The Applicant acknowledges and agrees that it does not and will not redistribute any product distributed by Cardinal Health in the secondary market, including but not limited to, (i) pharmaceutical product purchased from Cardinal Health; and/or (ii) Cardinal Health self-manufactured products.

4. If Cardinal Health does not receive payment in accordance with the payment terms or based upon credit considerations deemed relevant to Cardinal Health, then Cardinal Health may refuse to deliver the product covered by this Agreement (the "Product"), refuse additional orders, modify payment terms, place the Applicant on C.O.D., modify Applicant's cost of goods, limit or terminate the extension of credit and will be entitled to any other remedies available at law or in equity. Until the Product is paid for in full, Cardinal Health retains, and the Applicant hereby grants Cardinal Health, a security interest in the Product.

5. All payments shall be made in full, in good funds, either by check or electronic funds transfer (either by wire or automated clearinghouse), and in accordance with the payment terms. Cardinal Health may assess a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Applicant to Cardinal Health when due under the terms of this Agreement. Failure or delay by Cardinal Health to bill Applicant for any such service charge will not waive Cardinal Health's right to receive the same. In the event of default in payments on any invoices, Cardinal Health shall have the right to declare all invoices immediately due and payable. Applicant shall pay all out-of-pocket expenses, including attorneys' fees and disbursements, incurred by Cardinal Health to collect any amounts due under this Agreement or to otherwise enforce any of the terms of this Agreement.

6. If applicable, Applicant attests to Cardinal Health that it or the physician(s) employed and/or affiliated with Applicant are properly licensed with applicable state licensing agencies to receive, dispense, distribute and otherwise legally dispose of the Product. Applicant understands that by attesting to this, Cardinal Health is complying with the "good faith inquiry" standard to ensure that the Product is distributed to properly licensed and/or registered pharmacy locations. Prior to purchasing the Product from Cardinal Health hereunder, Applicant must provide Cardinal Health with copies of all such licenses and any renewals, revocations or other changes to the same.

7. Applicant agrees that Product will be purchased under Cardinal Health's standard terms and conditions as in effect from time to time or such other terms and conditions as set forth in a vendor agreement between Applicant and Cardinal Health (the standard terms and conditions and the vendor agreement shall hereinafter be collectively referred to as the "Terms and Conditions"). The Terms and Conditions are hereby incorporated by reference and made a part hereof. Applicant acknowledges that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and agrees to be bound by such modifications or amendments.

8. Without limiting Cardinal Health's rights under law or in equity, Cardinal Health (including its affiliates, subsidiaries, parent or related entities, collectively or individually), may exercise a right of set-off against any and all amounts due Applicant. For purposes of this Section 8, Cardinal Health shall be deemed to be a single creditor.

9. Applicant agrees to all the terms and conditions of this Agreement and the Terms and Conditions. This Agreement, the Terms and Conditions together with all invoices, purchase orders, and the exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, belief/bid responses, and understandings between the parties relative to the subject matter hereof. No changes to this Agreement or any purchase orders will be made or be binding upon either party unless made in writing and signed by each party. By signing this Agreement, Cardinal Health and Applicant each represent that it has the authority to bind its respective party to this Agreement, provided, that the Terms and Conditions may be amended or modified by Cardinal Health from time to time and Applicant agrees to be bound by such modifications or amendments.

10. All Applicable taxes including Federal Excise Tax will be collected as part of the sale.

11. All information provided in this Application or otherwise submitted is true and correct and is being (or will be) furnished for the purpose of obtaining/retaining credit from Cardinal Health Applicant shall provide Cardinal Health with financial statements and such further information as may reasonably be requested by Cardinal Health from time to time. Applicant authorizes Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. Applicant acknowledges and agrees to the sharing of financial statements and other information between and among Cardinal Health - affiliated entities.

12. If your application for business credit is denied, you have the right to a written statement of the specific reasons for the denial. To obtain the statement, please contact Cardinal Health in writing within sixty (60) days from the date you are notified of our decision. We will send you a written statement of the specific reason(s) for the denial within 30 days of receiving your request for the statement. The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation, marital status, familial status, age (provided the applicant has the capacity to enter into a binding contract), handicapping condition of the applicant; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

## Section IV - AUTHORIZED SIGNATURE

| Print Legal Name As It Appears On The Application in Section I | By: Authorized Signature | Title | By: Printed Name Of Signator | Date |
|---|---|---|---|---|
| CGM Inc DBA The medicine shoppe | Dee Halardu | Owner PBPh | Sherry Richardson | 6-25-08 |

## Section V - SECURITY AGREEMENT

This agreement is made____200__, between Cardinal Health, whose principal address for purposes of this agreement is
and Applicant, whose address is listed above as well as any and all other business addresses, ("Applicant") who hereby agree as follows intending to be legally bound:

Applicant hereby grants to Cardinal Health a security interest in all personal property of the Applicant, wherever located and whether now owned or hereafter acquired:

All goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers computer software, shelving, check-out counters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral").

This agreement secures all obligations of Applicant to Cardinal Health, whether now existing or hereafter arising, for principal, service charges, costs or other amounts, matured or unmatured, including without limitation obligations to make payment for all merchandise or service purchased by Applicant from or on the credit of Cardinal Health, and any obligations under this or any other agreement or arrangement between Applicant and Cardinal Health, whether or not any such obligations are now or hereafter evidenced by open account, promissory notes or other documents and irrespective of any guarantees or other security now or hereafter given for any such obligations.

APPLICANT:

By: Applicant Signature    Shi Rehault
President    Ower

Its: Officer Title

CARDINAL HEALTH:

By: Cardinal Health signature    Dan Am

Its: Officer Title    Manager Credit Underwriting

## Section VI - GUARANTEE

The undersigned Principal(s) of Applicant, by reason of their interest in Applicant and as an inducement for Cardinal Health to extend credit to Applicant, hereby jointly and severally, irrevocably, and unconditionally guarantee to Cardinal Health and its subsidiaries, affiliates and successors (each a Guarantee Party) and assigns the prompt and full payment (and not merely the ultimate collectability and performance of all obligation of Applicant to each Guaranteed Party, whether now existing or hereafter arising. The undersigned authorize Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. If Applicant or its business is hereafter sold, this guaranty shall continue to all credit hereafter made available to that Applicant or its business (as the case may be) until such time as Cardinal Health has received 5 days advanced written notice (via certified mail, return receipt requested) that Applicant and/or Principal(s) will no longer be responsible for credit thereafter made available with the respect to that Applicant or its business.

THE UNDERSIGNED ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FROM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.

| By: GUARANTOR SIGNATURE | Sherry O Richardson | 6-25-08 |
|---|---|---|
| | By: PRINTED NAME OF GUARANTOR | DATE |
| By: GUARANTOR SIGNATURE | John E Richadsa Jr | 6-25-08 |
| | By: PRINTED NAME OF GUARANTOR | DATE |
| By: GUARANTOR SIGNATURE | By: PRINTED NAME OF GUARANTOR | DATE |

*The term "Cardinal Health" shall mean collectively all subsidiary, related and affiliated companies of Cardinal Health, Inc. ("CHI"), an Ohio corporation, whether existing now or in the future.

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company [132102492]        800-858-5294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Corporation Service Company [132102492]

801 Adlai Stevenson Dr

Springfield, IL 62703
USA

Alabama
Sec. Of State
B. 17-7279600 FS
Date 06/07/2017
Time 08:21 AM
170607    1 Pg
File      $15.00
Access    $9.75
Conv      $4.50
Total     $29.25
7596970

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| | |
|---|---|
| 1a. ORGANIZATION'S NAME | |
| CGM, Inc. | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1144 Airport Drive | Alexander City | AL | 35010 | USA |

| ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|
| | | AL | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | |
|---|---|
| | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|
| | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | |
|---|---|
| CARDINAL HEALTH 110 LLC, AS AGENT | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7000 Cardinal Place | Dublin | OH | 43017 | USA |

4. This FINANCING STATEMENT covers the following collateral:        ☐ ATTACHMENT

All business assets, including but not limited to, goods, equipment, inventory, accounts, accounts receivable, chattel paper, instruments, investment property and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to any of the foregoing (including, without limitation, all prescription files, patient lists, signs, appliances, cash registers, computers, computer software, shelving, check-out counters, compressors, freezers, coolers, display cases, customer records, sundries, tobacco products, prescription and over-the-counter pharmaceutical products, health and beauty aids, home healthcare products and general merchandise and supplies); all accessions and additions to, substitutions for, and replacements of any of the foregoing; all proceeds or products of any of the foregoing; and all rights to payments under any insurance or warranty, guaranty, or indemnity payable with respect to any of the foregoing (collectively, the "Collateral").

| 5. ALTERNATIVE DESIGNATION [if applicable] | | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|---|

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

132102492

FILING OFFICE COPY ☐ NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**EXHIBIT C**

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 27 3:54 PM-21CV005850

### EXHIBIT D
### INVOICE LISTING

| Account | Reference Number | Date | Amount |
|---|---|---|---|
| | 3919264 | 3/6/2019 | $6,314.65 |
| | 4019459 | 4/1/2019 | $3,454.57 |
| | 4025207 | 4/2/2019 | $132.34 |
| | 4031367 | 4/3/2019 | $977.86 |
| | 4036466 | 4/4/2019 | $143.63 |
| | 4036461 | 4/4/2019 | $75.26 |
| | 4041293 | 4/5/2019 | $3,124.66 |
| | 4047904 | 4/8/2019 | $3,056.65 |
| | 4053487 | 4/9/2019 | $1,665.98 |
| | 4063363 | 4/11/2019 | $4,288.07 |
| | 4074412 | 4/15/2019 | $2,701.21 |
| | 4082189 | 4/17/2019 | $64.77 |
| | 4084937 | 4/17/2019 | $187.12 |
| | 4090591 | 4/18/2019 | $1,344.16 |
| | 4095165 | 4/19/2019 | $3,334.76 |
| | 4099962 | 4/22/2019 | $1,290.73 |
| | 4102246 | 4/23/2019 | $840.10 |
| | 4106438 | 4/23/2019 | $4,118.13 |
| | 4110967 | 4/24/2019 | $1,040.03 |
| | 4115269 | 4/25/2019 | $2,396.14 |
| | 4120197 | 4/26/2019 | $193.62 |
| | 4125771 | 4/29/2019 | $3,047.13 |
| | 4131457 | 4/30/2019 | $977.86 |
| | 4136606 | 5/1/2019 | $5,661.98 |
| | 4137600 | 5/1/2019 | $12.26 |
| | 4142085 | 5/2/2019 | $3,448.08 |
| | 4154173 | 5/6/2019 | $3,284.42 |
| | 4152135 | 5/6/2019 | $2,623.88 |
| | 4160140 | 5/7/2019 | $687.72 |
| | 4164502 | 5/8/2019 | $1,029.58 |
| | 4170234 | 5/9/2019 | $2,165.65 |
| | 4170228 | 5/9/2019 | $1,201.58 |
| | 4167836 | 5/9/2019 | $17.94 |
| | 4174400 | 5/10/2019 | $285.08 |
| | 4180637 | 5/13/2019 | $3,081.71 |
| | 4185630 | 5/14/2019 | $3,772.14 |
| | 4192534 | 5/16/2019 | $21.18 |
| | 4192533 | 5/16/2019 | $635.63 |
| | 4192535 | 5/16/2019 | $125.76 |
| | 4195814 | 5/16/2019 | $2,070.04 |
| | 4199724 | 5/17/2019 | $1,769.30 |
| | 4206810 | 5/20/2019 | $253.02 |
| | 4209323 | 5/21/2019 | $580.14 |
| | 4211305 | 5/21/2019 | $710.38 |
| | 4209322 | 5/21/2019 | $580.14 |
| | 4216284 | 5/22/2019 | $2,118.94 |
| | 4220875 | 5/23/2019 | $898.96 |
| | 4225640 | 5/24/2019 | $762.88 |

| | | |
|---|---|---|
| 4232317 | 5/28/2019 | $1,433.01 |
| 4238914 | 5/29/2019 | $1,317.37 |
| 4244140 | 5/30/2019 | $4,376.71 |
| 4248893 | 5/31/2019 | $58.42 |
| 4255974 | 6/3/2019 | $1,723.49 |
| 4261372 | 6/4/2019 | $1,252.79 |
| 4266081 | 6/5/2019 | $733.97 |
| 4270911 | 6/6/2019 | $779.38 |
| 4275856 | 6/7/2019 | $934.78 |
| 4282566 | 6/10/2019 | $2,797.25 |
| 4288431 | 6/11/2019 | $4,264.73 |
| 4293269 | 6/12/2019 | $1,214.62 |
| 4297159 | 6/13/2019 | $1,222.89 |
| 4297799 | 6/13/2019 | $76.87 |
| 4309830 | 6/17/2019 | $2,538.01 |
| 4307345 | 6/17/2019 | $2,475.86 |
| 4315570 | 6/18/2019 | $1,049.29 |
| 4318630 | 6/19/2019 | $122.35 |
| 4324768 | 6/20/2019 | $317.47 |
| 4328846 | 6/21/2019 | $2,563.09 |
| 4335765 | 6/24/2019 | $742.68 |
| 4339619 | 6/25/2019 | $27.34 |
| 4339620 | 6/25/2019 | $1,249.07 |
| 4345682 | 6/26/2019 | $755.27 |
| 4350440 | 6/27/2019 | $1,481.26 |
| 4353607 | 6/28/2019 | $1,951.44 |
| 4360154 | 7/1/2019 | $41.03 |
| 4362065 | 7/1/2019 | $1,063.19 |
| 4365914 | 7/2/2019 | $264.68 |
| 4367531 | 7/2/2019 | $661.66 |
| 4372667 | 7/3/2019 | $2,174.48 |
| 4378570 | 7/5/2019 | $30.42 |
| 4377055 | 7/5/2019 | $824.81 |
| 4385804 | 7/8/2019 | $1,452.86 |
| 4390192 | 7/9/2019 | $104.97 |
| 4395216 | 7/10/2019 | $1,805.88 |
| 4400013 | 7/11/2019 | $1,363.24 |
| 4308078 | 6/17/2019 | $10.52 |
| 8642510 | 8/9/2019 | ($25.90) |
| | **TOTAL 10553375** | **$129,799.07** |
| 3785922 | 2/1/2019 | $53.04 |
| 3803518 | 2/6/2019 | $6.74 |
| 3898910 | 3/1/2019 | $370.76 |
| 3909409 | 3/4/2019 | $48.94 |
| 3919260 | 3/6/2019 | $46.76 |
| 3924444 | 3/7/2019 | $3.79 |
| 3929812 | 3/8/2019 | $9.41 |
| 3929810 | 3/8/2019 | $10.42 |
| 3936984 | 3/11/2019 | $9.01 |
| 3936985 | 3/11/2019 | $7.77 |

| | | |
|---|---|---|
| 3957667 | 3/15/2019 | $27.00 |
| 4079724 | 4/16/2019 | $118.97 |
| 4079723 | 4/16/2019 | $2,170.66 |
| 4079726 | 4/16/2019 | $90.26 |
| 4079725 | 4/16/2019 | $884.06 |
| 4085614 | 4/17/2019 | $81.00 |
| 4084936 | 4/17/2019 | $69.66 |
| 4084934 | 4/17/2019 | $255.01 |
| 4084933 | 4/17/2019 | $6,995.77 |
| 4084935 | 4/17/2019 | $23.34 |
| 4085004 | 4/17/2019 | $593.32 |
| 4090594 | 4/18/2019 | $16.24 |
| 4090593 | 4/18/2019 | $9,103.63 |
| 4095166 | 4/19/2019 | $6,912.12 |
| 4095167 | 4/19/2019 | $3,441.75 |
| 4105445 | 4/23/2019 | $6,164.91 |
| 3957670 | 3/15/2019 | $30.10 |
| 3962209 | 3/18/2019 | $17.85 |
| 3975858 | 3/20/2019 | $18.84 |
| 3982997 | 3/22/2019 | $17.85 |
| 3990161 | 3/25/2019 | $314.22 |
| 3990375 | 3/25/2019 | $28.33 |
| 3990356 | 3/25/2019 | $59.88 |
| 4001244 | 3/27/2019 | $18.84 |
| 4136603 | 5/1/2019 | $8,607.69 |
| 4136605 | 5/1/2019 | $23.25 |
| 4136604 | 5/1/2019 | $43.01 |
| 4135513 | 5/1/2019 | $36.52 |
| 4138181 | 5/2/2019 | $635.50 |
| 4142083 | 5/2/2019 | $188.59 |
| 4142082 | 5/2/2019 | $5,559.23 |
| 4142084 | 5/2/2019 | $831.90 |
| 4147133 | 5/3/2019 | $154.41 |
| 4147132 | 5/3/2019 | $3,431.60 |
| 4147134 | 5/3/2019 | $226.42 |
| 4154171 | 5/6/2019 | $124.15 |
| 4154172 | 5/6/2019 | $44.94 |
| 4152134 | 5/6/2019 | $463.71 |
| 4154170 | 5/6/2019 | $381.14 |
| 4154169 | 5/6/2019 | $5,513.83 |
| 4160137 | 5/7/2019 | $371.30 |
| 4160138 | 5/7/2019 | $839.47 |
| 4160136 | 5/7/2019 | $6,278.44 |
| 4160139 | 5/7/2019 | $115.05 |
| 4164501 | 5/8/2019 | $3,274.85 |
| 4164500 | 5/8/2019 | $192.76 |
| 4164499 | 5/8/2019 | $770.34 |
| 4170233 | 5/9/2019 | $1,154.05 |
| 4170231 | 5/9/2019 | $121.88 |
| 4167835 | 5/9/2019 | $926.88 |
| 4170232 | 5/9/2019 | $3,464.15 |
| 4174396 | 5/10/2019 | $109.75 |

| | | |
|---|---|---|
| 4174397 | 5/10/2019 | $202.37 |
| 4174394 | 5/10/2019 | $388.29 |
| 4174395 | 5/10/2019 | $4,271.10 |
| 4180634 | 5/13/2019 | $6,357.80 |
| 4180636 | 5/13/2019 | $45.76 |
| 4180635 | 5/13/2019 | $1,760.55 |
| 4180632 | 5/13/2019 | $93.60 |
| 4180633 | 5/13/2019 | $1,305.83 |
| 4185629 | 5/14/2019 | $6,647.43 |
| 4185628 | 5/14/2019 | $91.43 |
| 3897929 | 3/1/2019 | $15.84 |
| 3943460 | 3/13/2019 | $13.29 |
| 3953611 | 3/15/2019 | $9.16 |
| 4068384 | 4/12/2019 | $13.70 |
| 4072435 | 4/15/2019 | $9.01 |
| 4192532 | 5/16/2019 | $1,068.10 |
| 4192530 | 5/16/2019 | $7,083.40 |
| 4192531 | 5/16/2019 | $73.82 |
| 4195808 | 5/16/2019 | $408.29 |
| 4195810 | 5/16/2019 | $247.81 |
| 4195809 | 5/16/2019 | $4,471.18 |
| 4195811 | 5/16/2019 | $206.10 |
| 4200024 | 5/17/2019 | $5,269.48 |
| 4200022 | 5/17/2019 | $409.45 |
| 4200023 | 5/17/2019 | $3,413.32 |
| 4200025 | 5/17/2019 | $90.26 |
| 4206798 | 5/20/2019 | $77.50 |
| 4206800 | 5/20/2019 | $127.02 |
| 4206797 | 5/20/2019 | $9,157.14 |
| 4206799 | 5/20/2019 | $1,211.37 |
| 4211302 | 5/21/2019 | $88.15 |
| 4211296 | 5/21/2019 | $6,826.73 |
| 4209317 | 5/21/2019 | $0.02 |
| 4211303 | 5/21/2019 | $397.44 |
| 4211297 | 5/21/2019 | $460.37 |
| 4216311 | 5/22/2019 | $6,099.25 |
| 4216310 | 5/22/2019 | $100.76 |
| 4220919 | 5/23/2019 | $4,584.41 |
| 4220918 | 5/23/2019 | $90.62 |
| 4225639 | 5/24/2019 | $46.41 |
| 4225638 | 5/24/2019 | $4,169.58 |
| 4232315 | 5/28/2019 | $4,314.19 |
| 4234139 | 5/28/2019 | $436.35 |
| 4232316 | 5/28/2019 | $145.01 |
| 4238910 | 5/29/2019 | $6,537.60 |
| 4238913 | 5/29/2019 | $328.66 |
| 4238912 | 5/29/2019 | $455.00 |
| 4238911 | 5/29/2019 | $13.32 |
| 4244139 | 5/30/2019 | $267.03 |
| 4244137 | 5/30/2019 | $5,440.46 |
| 4244138 | 5/30/2019 | $347.85 |
| 4248892 | 5/31/2019 | $52.22 |

0F615 - G53

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 25 3:04 PM-20CV003468
Case 01-01-0123 SEM-5 Doc of the common Pleas/2021 Aug 25 of 64 PACV B35 4854

| | | |
|---|---|---|
| 4248891 | 5/31/2019 | $616.14 |
| 4248890 | 5/31/2019 | $3,475.35 |
| 3971282 | 3/20/2019 | $5.59 |
| 3981447 | 3/22/2019 | $2.75 |
| 3999196 | 3/27/2019 | $6.00 |
| 4076910 | 4/16/2019 | $36.88 |
| 4088486 | 4/18/2019 | $40.32 |
| 4091572 | 4/19/2019 | $70.92 |
| 4099724 | 4/22/2019 | $11.09 |
| 4102285 | 4/23/2019 | $154.81 |
| 4112529 | 4/25/2019 | $3.79 |
| 4252155 | 6/3/2019 | $635.50 |
| 4255973 | 6/3/2019 | $4,137.19 |
| 4255970 | 6/3/2019 | $9.28 |
| 4255972 | 6/3/2019 | $732.44 |
| 4255971 | 6/3/2019 | $342.68 |
| 4261370 | 6/4/2019 | $178.32 |
| 4261367 | 6/4/2019 | $4,156.40 |
| 4261369 | 6/4/2019 | $482.88 |
| 4261368 | 6/4/2019 | $1,487.29 |
| 4262469 | 6/5/2019 | $0.01 |
| 4266080 | 6/5/2019 | $336.28 |
| 4266078 | 6/5/2019 | $2,973.84 |
| 4269927 | 6/6/2019 | $93.28 |
| 4270908 | 6/6/2019 | $87.89 |
| 4270907 | 6/6/2019 | $1,043.67 |
| 4270909 | 6/6/2019 | $400.60 |
| 4270906 | 6/6/2019 | $4,615.65 |
| 4275855 | 6/7/2019 | $4,470.30 |
| 4275853 | 6/7/2019 | $147.44 |
| 4274593 | 6/7/2019 | $228.78 |
| 4275854 | 6/7/2019 | $2,875.53 |
| 4282554 | 6/10/2019 | $2,386.33 |
| 4281037 | 6/10/2019 | $407.14 |
| 4282556 | 6/10/2019 | $715.43 |
| 4282578 | 6/10/2019 | $264.91 |
| 4282555 | 6/10/2019 | $8,199.05 |
| 4288081 | 6/11/2019 | $5,785.79 |
| 4288082 | 6/11/2019 | $362.82 |
| 4293264 | 6/12/2019 | $3,194.85 |
| 4293262 | 6/12/2019 | $9,745.88 |
| 4293263 | 6/12/2019 | $223.18 |
| 4293265 | 6/12/2019 | $206.10 |
| 4297152 | 6/13/2019 | $2,034.15 |
| 4297154 | 6/13/2019 | $710.89 |
| 4297151 | 6/13/2019 | $6,253.36 |
| 4297155 | 6/13/2019 | $448.94 |
| 4026528 | 4/3/2019 | $2.37 |
| 4054132 | 4/10/2019 | $15.96 |
| 4145525 | 5/3/2019 | $33.06 |
| 4162566 | 5/8/2019 | $9.78 |
| 4173150 | 5/10/2019 | $6.88 |

| | | |
|---|---|---|
| 4309825 | 6/17/2019 | $2,088.84 |
| 4309827 | 6/17/2019 | $38.11 |
| 4309826 | 6/17/2019 | $2,859.97 |
| 4307343 | 6/17/2019 | $1,504.80 |
| 4307342 | 6/17/2019 | $8,345.24 |
| 4307344 | 6/17/2019 | $446.22 |
| 4315565 | 6/18/2019 | $258.06 |
| 4315567 | 6/18/2019 | $797.31 |
| 4315566 | 6/18/2019 | $5,155.40 |
| 4320709 | 6/19/2019 | $1,356.10 |
| 4320707 | 6/19/2019 | $3,057.68 |
| 4320708 | 6/19/2019 | $120.04 |
| 4324764 | 6/20/2019 | $573.04 |
| 4324761 | 6/20/2019 | $2,252.93 |
| 4324763 | 6/20/2019 | $926.88 |
| 4324762 | 6/20/2019 | $122.97 |
| 4333879 | 6/24/2019 | $6.64 |
| 4335755 | 6/24/2019 | $119.07 |
| 4333880 | 6/24/2019 | $10.38 |
| 4335753 | 6/24/2019 | $247.81 |
| 4335752 | 6/24/2019 | $3,693.82 |
| 4335751 | 6/24/2019 | $110.11 |
| 4333878 | 6/24/2019 | $3,097.86 |
| 4339610 | 6/25/2019 | $35.40 |
| 4339612 | 6/25/2019 | $495.62 |
| 4339611 | 6/25/2019 | $4,125.52 |
| 4345677 | 6/26/2019 | $111.72 |
| 4345678 | 6/26/2019 | $274.41 |
| 4345680 | 6/26/2019 | $193.86 |
| 4345679 | 6/26/2019 | $678.05 |
| 4350439 | 6/27/2019 | $62.61 |
| 4350438 | 6/27/2019 | $1,587.09 |
| 4350437 | 6/27/2019 | $369.12 |
| 4355351 | 6/28/2019 | $75.38 |
| 4355356 | 6/28/2019 | $1,297.59 |
| 4355353 | 6/28/2019 | $678.05 |
| 4355352 | 6/28/2019 | $904.12 |
| 4355350 | 6/28/2019 | $2,408.58 |
| 4362057 | 7/1/2019 | $348.36 |
| 4362058 | 7/1/2019 | $157.54 |
| 4362059 | 7/1/2019 | $678.05 |
| 4362056 | 7/1/2019 | $3,767.45 |
| 4368156 | 7/2/2019 | $76.54 |
| 4368155 | 7/2/2019 | $636.72 |
| 4368154 | 7/2/2019 | $4,372.71 |
| 4363141 | 7/2/2019 | $635.50 |
| 4372662 | 7/3/2019 | $89.91 |
| 4372663 | 7/3/2019 | $5,229.79 |
| 4372664 | 7/3/2019 | $2,034.15 |
| 4377050 | 7/5/2019 | $4,022.67 |
| 4377054 | 7/5/2019 | $384.42 |
| 4377051 | 7/5/2019 | $20.44 |

| | | |
|---|---|---|
| 4375776 | 7/5/2019 | $783.26 |
| 4377052 | 7/5/2019 | $41.73 |
| 4377053 | 7/5/2019 | $171.30 |
| 4385802 | 7/8/2019 | $46.32 |
| 4385799 | 7/8/2019 | $9,779.49 |
| 4385798 | 7/8/2019 | $75.54 |
| 4385801 | 7/8/2019 | $517.11 |
| 4385800 | 7/8/2019 | $2,604.06 |
| 8567020 | 7/8/2019 | ($25.39) |
| 4390224 | 7/9/2019 | $1,896.07 |
| 4390222 | 7/9/2019 | $12,372.55 |
| 4390223 | 7/9/2019 | $611.88 |
| 4395214 | 7/10/2019 | $2,266.34 |
| 4395212 | 7/10/2019 | $196.28 |
| 4395213 | 7/10/2019 | $3,779.06 |
| 4395215 | 7/10/2019 | $397.36 |
| 8542460 | 7/10/2019 | ($168.00) |
| 8542470 | 7/10/2019 | ($33.89) |
| 4400010 | 7/11/2019 | $188.83 |
| 4400012 | 7/11/2019 | $58.32 |
| 4400009 | 7/11/2019 | $2,115.05 |
| 4400011 | 7/11/2019 | $1,447.12 |
| 4133175 | 5/1/2019 | $8.76 |
| 4280835 | 6/10/2019 | $30.11 |
| 4307534 | 6/17/2019 | $10.45 |
| 4307445 | 6/17/2019 | $8.55 |
| 4307336 | 6/17/2019 | $9.31 |
| 8592130 | 7/16/2019 | ($260.91) |
| 8592140 | 7/16/2019 | ($70.70) |
| 8592120 | 7/17/2019 | ($661.44) |
| 4308072 | 6/17/2019 | $10.52 |
| 4313441 | 6/18/2019 | $9.88 |
| 4313440 | 6/18/2019 | $58.94 |
| 4333961 | 6/24/2019 | $2.81 |
| 4334208 | 6/24/2019 | $78.43 |
| 4477082 | 8/2/2019 | $635.50 |
| 8680550 | 8/15/2019 | ($77.51) |
| 8680560 | 8/15/2019 | ($40.94) |
| 4289388 | 6/12/2019 | $4.80 |
| 4362055 | 7/1/2019 | $9.09 |
| 4365911 | 7/2/2019 | $6.92 |
| 4365912 | 7/2/2019 | $4.94 |
| 8680110 | 8/16/2019 | ($8.63) |
| 8680240 | 8/16/2019 | ($3.16) |
| 8680230 | 8/16/2019 | ($52.96) |
| 4316266 | 6/19/2019 | $38.80 |
| 4316528 | 6/19/2019 | $2.28 |
| 4583764 | 9/2/2019 | $565.50 |
| 8801600 | 9/6/2019 | ($3,731.95) |
| 4369187 | 7/3/2019 | $6.26 |
| 4383163 | 7/8/2019 | $3.53 |
| 4383110 | 7/8/2019 | $13.34 |

| | | |
|---|---|---|
| 4387887 | 7/9/2019 | $6.56 |
| 4510419 | 8/12/2019 | $6.92 |
| 4701631 | 10/2/2019 | $565.50 |
| 8880730 | 10/2/2019 | ($8.93) |
| 4839277 | 11/2/2019 | $565.50 |
| 9086080 | 12/5/2019 | ($596.40) |
| 9394570 | 3/3/2020 | ($134.10) |
| 9719370 | 6/3/2020 | ($251.03) |
| 0044970 | 9/2/2020 | ($1,272.32) |
| 0352200 | 12/8/2020 | ($214.51) |
| 0633100 | 3/5/2021 | ($262.73) |
| | **TOTAL 10552205** | **$359,587.67** |
| | **TOTAL** | **$489,386.74** |

# MARYELLEN O'SHAUGHNESSY

## FRANKLIN COUNTY CLERK OF COURTS
## GENERAL DIVISION, COURT OF COMMON PLEAS

CASE TITLE:  CARDINAL HEALTH 110 LLC ET AL -VS- CGM INC ET AL     CASE NUMBER: 21CV005468

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
COMPLAINT
EXHIBITS Exhibits A-D to the Complaint

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
CGM INC
1144 AIRPORT DRIVE
SHERRY D TREMELLING RA
ALEXANDER CITY, AL  35010

JUVENILE CITATIONS ONLY:

    HEARING TYPE:

    _ Date already scheduled at  :  Courtroom:

Electronically Requested by:  SUSAN K. CLIFFEL
Attorney for:

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Aug 25 3:54 PM-21CV005468

# MARYELLEN O'SHAUGHNESSY

## FRANKLIN COUNTY CLERK OF COURTS
## GENERAL DIVISION, COURT OF COMMON PLEAS

**CASE TITLE:  CARDINAL HEALTH 110 LLC ET AL -VS- CGM INC ET AL     CASE NUMBER: 21CV005468**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
COMPLAINT
EXHIBITS Exhibits A-D to the Complaint

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
JOHN RICHARDSON
1116 GRAYLYNN DRIVE
VESTAVIA, AL  35216

JUVENILE CITATIONS ONLY:

    HEARING TYPE:

    __ Date already scheduled at  :  Courtroom:

**Electronically Requested by:**  SUSAN K. CLIFFEL
**Attorney for:**

# MARYELLEN O'SHAUGHNESSY

## FRANKLIN COUNTY CLERK OF COURTS
## GENERAL DIVISION, COURT OF COMMON PLEAS

**CASE TITLE:  CARDINAL HEALTH 110 LLC ET AL -VS- CGM INC ET AL     CASE NUMBER: 21CV005468**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
COMPLAINT
EXHIBITS Exhibits A-D to the Complaint

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
SHERRY D TREMELLING
963 GOODWATER ROAD
ALEXANDER CITY, AL  35010

---

JUVENILE CITATIONS ONLY:

   HEARING TYPE:

   __ Date already scheduled at  :  Courtroom:

---

**Electronically Requested by:  SUSAN K. CLIFFEL**
**Attorney for:**

**E3332 – N79**

FROM

## MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
373 SOUTH HIGH STREET
COLUMBUS, OHIO 43215-4579

```
C E R T  I F  I E D
M A I L
R E C E I P T
```

08/30/21

CLERK OF COURTS

2021 AUG 31 PM 3: 26

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO

CGM INC
1144 AIRPORT DRIVE
SHERRY D TREMELLING R
ALEXANDER CITY, AL
35010

21CV-08-5468    H

CARDINAL HEALTH 110 L
VS
CGM INC

SERVICE ITEM: 01
ORIGINAL SUMMONS

CERTIFIED
NUMBER

9214890119 522807280174

CIV354

**E3332 – N78**

FROM

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
373 SOUTH HIGH STREET
COLUMBUS, OHIO 43215-4579

```
C E R T I F I E D
M A I L
R E C E I V E D
08/30/21
```

JOHN RICHARDSON
1116 GRAYLYNN DRIVE
VESTAVIA, AL
         35216

21CV-08-5468    H

CARDINAL HEALTH 110 L
      VS
CGM INC

SERVICE ITEM: 01
ORIGINAL SUMMONS

CERTIFIED
NUMBER

9214890119 522807280167

CIV354

**E3332 - N77**

FROM

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
373 SOUTH HIGH STREET
COLUMBUS, OHIO 43215-4579

```
C E R T I F I E D
M A I L
R E C E I P T
```

08/30/21

CLERK OF COURTS

2021 AUG 31 PM 3: 25

COMMON PLEAS COURT
FRANKLIN CO. OHIO
FILED

```
SHERRY D. TREMELLING
963 GOODWATER ROAD
ALEXANDER CITY, AL
          35010
```

```
21CV-08-5468    H

CARDINAL HEALTH 110 L
       VS
CGM INC

SERVICE ITEM: 01
ORIGINAL SUMMONS
```

CERTIFIED
 NUMBER

9214890119 522807280150

CIV354

E3332 - L60



**MARYELLEN O'SHAUGHNESSY**
**CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215**
**CIVIL DIVISION**

CARDINAL HEALTH 110 LLC
7000 CARDINAL PLACE
DUBLIN, OH 43017,

                    PLAINTIFF,
          VS.

CGM INC
1144 AIRPORT DRIVE
SHERRY D TREMELLING RA
ALEXANDER CITY, AL 35010,

                    DEFENDANT.

**21CV-08-5468**
**CASE NUMBER**

                    **\*\*\*\* SUMMONS \*\*\*\***          08/27/21

TO THE FOLLOWING NAMED DEFENDANT:
      CGM INC
      1144 AIRPORT DRIVE
      SHERRY D TREMELLING RA
      ALEXANDER CITY, AL 35010


YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY
COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY:    CARDINAL HEALTH 110 LLC
       7000 CARDINAL PLACE
       DUBLIN, OH 43017,

                                        **PLAINTIFF(S).**

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF
THE PLAINTIFF'S ATTORNEY IS:
      ALLEN CARTER
      41 S HIGH ST 29TH FL
      COLUMBUS, OH 43215



YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S
ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY
OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE
OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER
MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A
COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY:  BROOKE ELLIOTT, DEPUTY CLERK

                                        (CIV370-S03)

E3332 - L59



MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

CARDINAL HEALTH 110 LLC
7000 CARDINAL PLACE
DUBLIN, OH 43017,

                    PLAINTIFF,
        VS.

CGM INC
1144 AIRPORT DRIVE
SHERRY D TREMELLING RA
ALEXANDER CITY, AL 35010,

                    DEFENDANT.

21CV-08-5468
CASE NUMBER

CLERK OF COURTS

2021 AUG 31 PM 3:17

COMMON PLEAS COURT
FRANKLIN CO. OHIO

                    **** SUMMONS ****                    08/27/21

TO THE FOLLOWING NAMED DEFENDANT:
        JOHN RICHARDSON
        1116 GRAYLYNN DRIVE
        VESTAVIA, AL 35216


YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY
COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO;
BY:    CARDINAL HEALTH 110 LLC
       7000 CARDINAL PLACE
       DUBLIN, OH 43017,

                                            PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF
THE PLAINTIFF'S ATTORNEY IS:
        ALLEN CARTER
        41 S HIGH ST 29TH FL
        COLUMBUS, OH 43215


YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S
ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY
OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE
OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER
MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A
COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY:  BROOKE ELLIOTT, DEPUTY CLERK

                                            (CIV370-S03)

**E3332 - L58**



MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

CARDINAL HEALTH 110 LLC
7000 CARDINAL PLACE
DUBLIN, OH 43017,

                    PLAINTIFF,
          VS.

CGM INC
1144 AIRPORT DRIVE
SHERRY D TREMELLING RA
ALEXANDER CITY, AL 35010,

                    DEFENDANT.

**21CV-08-5468**
**CASE NUMBER**

*2021 AUG 31 PM 3: 17*
*CLERK OF COURTS*
*COMMON PLEAS COURT*
*FRANKLIN CO. OHIO*

                    **** SUMMONS ****              08/27/21

TO THE FOLLOWING NAMED DEFENDANT:
        SHERRY D. TREMELLING
        963 GOODWATER ROAD
        ALEXANDER CITY, AL 35010


YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY
COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY:    CARDINAL HEALTH 110 LLC
       7000 CARDINAL PLACE
       DUBLIN, OH 43017,

                                        PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF
THE PLAINTIFF'S ATTORNEY IS:
        ALLEN CARTER
        41 S HIGH ST 29TH FL
        COLUMBUS, OH 43215


YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S
ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY
OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE
OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER
MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A
COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY:  BROOKE ELLIOTT, DEPUTY CLERK
                                        (CIV370-S03)



E33

**UNITED STATES**
**POSTAL SERVICE.**

FILED

2021 SEP -7 PM 2: 02

CLERK OF COURTS

Date Produced: 09/06/2021

COC:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 1952 2807 2801 74. Our records indicate that this item was delivered on 09/03/2021 at 10:46 a.m. in ALEXANDER CITY, AL 35010. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:          3501021CV05468CARDI



E333 **UNITED STATES POSTAL SERVICE.**



FILED

COMM N PLEAS COURT
FRANKLIN CO. OHIO

2021 SEP -7 PM 2: 02

CLERK OF COURTS

Date Produced: 09/06/2021

COC:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 1952 2807 2801 67. Our records indicate that this item was delivered on 09/03/2021 at 02:15 p.m. in BIRMINGHAM, AL 35216. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:        3521621CV05468CARDI